INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, PROGRESSIVE LODGE NO. 1000, Plaintiff–Appellant,

v.

GENERAL ELECTRIC COMPANY, Defendant–Appellee.

No. 88–1546.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1988.

Decided Jan. 20, 1989.

Rehearing and Rehearing En Banc Denied Feb. 22, 1989.

Greg Campbell, Diekemper Hammond Shinners Turcotte & Larrew, St. Louis, Mo., for plaintiff-appellant.

Charles B. Wolf, Vedder Price Kaufman & Kammholz, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and WILL, Senior Circuit Judge.*

POSNER, Circuit Judge.

This appeal requires us to interpret the arbitration clause in a collective bargaining agreement. Some background will help clarify the issues in the appeal. When an employer and a union negotiate a collective bargaining agreement they usually include both an arbitration clause, as the last step in a grievance procedure designed to prevent the discharge of employees without just cause, and a no-strike clause. The grievance and arbitration procedure is conventionally regarded as the union's compensation for surrendering the right to strike during the period while the agreement is in force—"the 'quid pro quo' for an agreement not to strike." *United Steel-*

*workers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578 n. 4, 80 S.Ct. 1347, 1350 n. 4, 4 L.Ed.2d 1409 (1960); see also *id.* at 582, 80 S.Ct. at 1352; *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957) ("plainly the agreement to arbitrate grievance disputes is the quid pro quo for the agreement not to strike"); Gorman, Basic Text on Labor Law: Unionization and Collective Bargaining 605–06 (1976). Grievance arbitration is a substitute for the strike as a method of preventing the employer from violating the agreement, and the union is unlikely to give up the right to strike without a substitute method for holding the employer to the terms of their bargain.

Although there is much language in the cases about a supposed public policy in favor of labor (as of other) arbitration, see, e.g., *United Steelworkers v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53, the grounding of such a policy is a bit obscure—like the courts' former hostility to arbitration, on which see Judge Frank's immortal opinion in *Kulukundis Shipping Co. v. Amtorg Trading Corp.,* 126 F.2d 978 (2d Cir.1942). The inclusion of particular clauses (an integration clause, a liquidated-damages clause, a time-is-of-the-essence clause, a *force majeure* clause—whatever) in a contract is usually assumed to be a matter between the contracting parties rather than an issue of social concern. Why should an arbitration clause in a collective bargaining agreement be different? Why should courts want to encourage labor arbitration? Several possible answers come to mind. The first is a desire to avoid strikes, which interrupt production and cause inconvenience to consumers and suppliers. An arbitration clause is, as we have said, a quid pro quo for a no-strike clause. Apparently, in making collective bargaining agreements judicially enforceable, the draftsmen of section 301 of the Taft–Hartley Act, 29 U.S.C. § 185, hoped this would "induce both parties to the labor contract to incorporate grievance and arbitration provisions on the

* Hon. Hubert L. Will of the Northern District of Illinois, sitting by designation.

one hand and on the other a no-strike, no-lockout clause," thus promoting industrial peace. Gorman, *supra*, at 605–06; cf. S.Rep. No. 105, 80th Cong., 1st Sess. 13–14, 17–18, 23 (1947). The second factor is the unhappy history of politically insensitive judicial intervention in labor disputes, intervention that precipitated the enactment in the 1930s of the Norris–LaGuardia and Wagner Acts. That history makes modern courts reluctant to adjudicate disputes between unions and employers. A closely related factor is the sense that specialists in labor relations are more sensitive adjudicators of such disputes than generalist federal judges would be. The last factor (which is nothing special to *labor* arbitration) is simply the overloaded condition of federal-court dockets. They would be even more overloaded if disputes over the meaning of collective bargaining agreements were commonly litigated directly under section 301, rather than arbitrated.

But despite contemporary judicial affection for labor arbitration, such arbitration remains, with rare exceptions, a creature of contract. Parties to collective bargaining agreements don't have to include an arbitration clause, and if they do include one its scope is governed by the terms of the clause they negotiate rather than by a judge's opinion concerning the merits of arbitration compared to the strike, or to federal-court litigation, or to other methods of resolving labor disputes. *United Steelworkers v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 582, 80 S.Ct. at 1352 ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"). An employer, therefore, is not required to arbitrate a grievance that is not within the scope of the arbitration clause. And whether it is or is not is an issue to be decided by the court asked to enforce the clause by ordering arbitration, rather than by the arbitrator. See, e.g., *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986); *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.*, 860 F.2d 1420, 1423 (7th Cir.1988);

*International Union of Operating Engineers v. Associated General Contractors of Illinois*, 845 F.2d 704, 706 (7th Cir.1988). The arbitrator is not the judge of his own authority—though to this, as to most, legal generalizations, there is an exception: the arbitrator, like any other adjudicator, is empowered to decide whether the parties have taken whatever procedural steps are required to preserve their right to arbitrate a particular dispute. See, e.g., *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 555–59, 84 S.Ct. 909, 917–19, 11 L.Ed.2d 898 (1964); *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc., supra*, 860 F.2d at 1424.

Article VIII of the collective bargaining agreement between General Electric and the machinists' union—the arbitration clause at issue in this case—is unusually narrow. It provides (in section 4) that the clause "shall be construed according to the understanding of the parties that they do not intend that arbitration shall be a means of deciding all disputes which may arise between them during the term of this agreement ... but shall be construed instead to mean that there shall be subject to arbitration only those disputes which the parties have specifically and plainly agreed to arbitrate as provided above." Among the provisions thus referred to is section 3(b), which provides: "It is specifically agreed that matters relating to the management of the Company, including but not limited to the right to control operation and the assignment of work, the establishment or modification of any wage, or job classification, or the authority to decide appropriate classification of any employee shall not be subject to arbitration; and it is understood that the parties have not agreed to arbitrate grievances which challenge actions taken by the Company in the exercise of any such rights, except where such challenge is based upon a violation of an express provision of this Agreement. It is also agreed ... that the arbitrator shall have no authority to interpret or apply this article [i.e., Article VIII, the arbitration clause]."

The facts pertinent to this lawsuit are not disputed. There are two grievances, and they are materially identical, so we shall describe just one. Fred Lind, a worker in a job that carried the job classification R–16, went on temporary sick leave. The company assigned a higher-rated employee, an R–19, to do his work, rather than recalling a laid-off employee, Donald Hassler, who had once filled the same job and who was the most senior laid-off worker qualified for it. The union claims that the failure to recall Hassler violates Article 24, § 14 of the collective bargaining agreement, which provides, so far as bears on this case, that "the following procedure will be used, when openings exist, in recalling employees to their former jobs from which they were removed for lack of work: ... Employees who have qualified on the job classification ... [and] have been either downgraded or laid off will be returned to their former job classifications on the basis of seniority." Lind's sick leave, the union argues, created an "opening" in his job that section 14 of Article 24 entitled Hassler to fill. The company argues that section 14 is merely procedural; it specifies the procedures to be followed if there is an opening but does not determine when there is an opening. The union cannot be said to be basing its grievance on an express provision of the collective bargaining agreement, and therefore there is no duty to arbitrate.

When the company refused to arbitrate, the union brought this section 301 suit, arguing that the company's refusal violated the collective bargaining agreement. The district judge ruled that the dispute was not within the scope of the arbitration clause, and he therefore dismissed the suit. Appellate review of the judge's ruling is plenary, since the only issue is the meaning of a written contract, and such an issue is still treated as a question of law when no evidence other than the contract itself is before the court. Many cases so hold with specific reference to arbitration clauses. See, e.g., *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1462–63 (9th Cir. 1983). As neither party questions the principle in this case, we shall repress our own doubts about its good sense. Appellate judges can read a document as well as trial judges, but now that appellate review of findings of fact based solely on documentary evidence has been held to be governed by the clearly-erroneous standard, *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), it is not obvious why the old practice of plenary ("de novo") appellate review of contract interpretation should persist. Plenary review of questions of law is necessary to assure that the law is reasonably uniform and predictable. This goal has less application to issues of contractual interpretation, although not zero application, for often either the same contract or identical language in different contracts gives rise to a number of lawsuits, and it is desirable that they be decided the same way. That is a common situation with insurance contracts and other form contracts—and with arbitration clauses as well, as we shall see. But the question of the continued appropriateness of the practice of plenary appellate review of contractual interpretation is for another day.

In contesting the district judge's interpretation, the union makes the superficially appealing argument that disputes over management prerogatives are nonarbitrable only if the union fails to base a grievance on a specified provision of the collective bargaining agreement. The union named Article 24, § 14; Article 24 is an express provision of the collective bargaining agreement; therefore the grievance is arbitrable, however slim the union's chances of persuading an arbitrator that the company violated Article 24. We agree with the company and the district judge that this is too wooden, too blinkered, too literal-minded an interpretation. A "grievance" is merely a claim of breach of the collective bargaining agreement (see *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 814 (7th Cir.1985), and cases cited there). (This is when there is a collective bargaining agreement; when there is not, the word has a broader signification, see *Szabo v. U.S. Marine Corp.*, 819 F.2d 714,

720 (7th Cir.1987).) Often the collective bargaining agreement will expressly define "grievance" as a claimed breach of the agreement. See, e.g., *Vantine v. Elkhart Brass Mfg. Co.*, 762 F.2d 511, 514 (7th Cir.1985). The agreement in this case does not define the term, but we do not understand either party to be contending that a grievance not founded on a breach of the collective bargaining agreement would be arbitrable. And any breach would of necessity be the breach of an *express* provision. All provisions of a collective bargaining agreement are express, i.e., written. True, when there are overlapping contracts, or when a party seeks to disambiguate a contractual provision by reference to the parties' practices, the concept of the "common law of the shop" comes into play. See, e.g., *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry.*, 768 F.2d 914, 923 (7th Cir.1985), quoting *United Steelworkers v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 582, 80 S.Ct. at 1352; *Chicago Newspaper Publishers' Ass'n v. Chicago Web Printing Pressmen's Union No. 7*, 821 F.2d 390, 395–97 (7th Cir.1987); *Chicago Web Printing Pressmen's Union, No. 7 v. Chicago Newspaper Publishers' Ass'n*, 772 F.2d 384, 387 (7th Cir.1985); *Manville Forest Products Corp. v. United Paperworkers Int'l Union*, 831 F.2d 72, 75 (5th Cir.1987). But this is not true common law; it is an interpretive concept. It denotes a methodology for interpreting a written contract, or written contracts, in particular circumstances, which happen not to be present in this case. Cf. *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 67, n. 19, 95 S.Ct. 977, 987, n. 19, 43 L.Ed.2d 12 (1975). (For a thoughtful discussion of the common law of the shop see Mittenthal, *Past Practice and the Administration of Collective Bargaining Agreements*, 59 Mich.L.Rev. 1017 (1961).)

Since every grievance the union might file against General Electric would invoke an express provision, the union's position that every such grievance is arbitrable would nullify the parties' unmistakably expressed intention not to make every grievance arbitrable. The union asks us to disregard not only the language of the arbitration clause, but its history. The present General Electric arbitration clause was adopted after an earlier clause had been interpreted to make work-assignment disputes arbitrable. See *Carey v. General Electric Co.*, 315 F.2d 499, 511–12 (2d Cir. 1963); *International Union of Electrical Workers v. General Electric Co.*, 332 F.2d 485 (2d Cir.1964). The language of the earlier clause "was extensively revised ... in a deliberate effort to limit the scope of arbitration." *International Union of Electrical Engineers v. General Electric Co.*, 407 F.2d 253, 256 (2d Cir.1968). See also *International Union of Electrical Engineers v. General Electric Co.*, 450 F.2d 1295, 1298 n. 3 (2d Cir.1971); *International Union, United Automobile Workers v. General Electric Co.*, 474 F.2d 1172, 1177 (6th Cir.1973); *Local 13, Int'l Federation of Engineers v. General Electric Co.*, 531 F.2d 1178 (3d Cir.1976). These decisions, although factually distinguishable, support General Electric's position in the present case, as does our dictum in *Dreis & Krump Mfg. Co. v. International Ass'n of Machinists*, 802 F.2d 247, 254 (7th Cir. 1986), citing the *Local 13* decision approvingly. It is true that in *International Union, United Automobile Workers v. General Electric Co.*, 714 F.2d 830 (8th Cir.1983), a case that involved General Electric and is factually similar to the present case, the court of appeals reversed the district court's order refusing to order arbitration. But the collective bargaining agreement may have been different, because the court made no reference to language comparable to that found in Article VIII of the agreement in the present case.

By "express provision" (a term not mentioned in the Eighth Circuit's *Automobile Workers* case) the parties to the collective bargaining agreement in the present case must have meant not any old provision of the agreement but a provision expressly addressed to the dispute the union seeks to arbitrate. *That* dispute is not over wages or aggregate employment or discipline; it is over work assignments: can they be made to existing workers or must the company give them to the most senior qualified worker who has been laid off?

No provision of the collective bargaining agreement addressed *this* question, for the excellent reason that the agreement states plainly (in Article VIII, § 3(b), quoted earlier) that "the assignment of work" is a nongrievable, nonarbitrable managerial prerogative.

We shall not interpret the "openings" provision on which the union relies. Maybe, as the union argues, that provision, in combination with the agreement's seniority clause, should be interpreted to limit the company's discretion to decide when there is an opening; maybe these provisions are in conflict with section 3(b) of Article VIII, and therefore invite a creative interpretation of the "common law of the shop." However, given Article VIII, the only relevant question for us is whether the "openings" provision, on which the union relies, is *expressly* addressed to the dispute over work assignments that the union wishes to grieve, and it is not. Whether it implicitly addresses the dispute, as the union argues, may be doubted, because such a reading would appear to gut section 3(b). But that is not for us to say. What is for us to say is that it is inconceivable that the provision expressly addresses such disputes, as it must for the dispute to be arbitrable under Article VIII.

AFFIRMED.