**FANSTEEL, INC., Plaintiff,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LODGE NO. 1777, Defendant.**

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LODGE NO. 1777, Plaintiff,**

v.

**FANSTEEL, INC., Defendant.**

Nos. 88 C 9091, 88 C 9147.

United States District Court,
N.D. Illinois, E.D.

March 7, 1989.

Stephen D. Shawe, Eric Hemmendinger, Shawe & Rosenthal, Baltimore, Md., William F. Mahoney, Segal, McCambridge, Singer & Mahoney, Chicago, Ill., for plaintiff.

William A. Widmer, III, John F. Ward, Carmell, Charone, Widmer & Mathews, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Fansteel, Inc. ("Fansteel"), a manufacturer of tantalum metal products, has sued International Association of Machinists and Aerospace Workers, Lodge No. 1777 ("Union") to vacate a September 29, 1988 Arbitrator's Opinion and Award (the "Award," FMCS No. 87–25922, Fansteel Complaint Ex. 1). Union has retorted by suing Fansteel for enforcement of the Award. Both parties have now moved for summary judgment in each case under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Fansteel's motion is granted in principal part and Union's is denied to the same extent.

### Facts[1]

In May 1987 Fansteel and Union were parties to a collective bargaining agreement ("CBA") due to expire May 31, covering about 80 employees at Fansteel's North Chicago plant. Before May 31 the parties engaged in extensive bargaining sessions but were unable to reach agreement. Fansteel warned Union that in the event of a strike it intended to hire replacement workers and continue operations. Union rejected Fansteel's final offer and went on strike June 1.

Fansteel began to hire replacements—39 of them. It assigned 31 of the new hires to Labor Grade 8, the entry-level classification.

After intervention of a federal mediator, Fansteel and Union resumed negotiations. In part Union sought the discharge or lay-off of the replacements so the strikers could return to work. Fansteel rejected that position.

Before the final negotiation session on July 10 Fansteel prepared a draft Strike Settlement Agreement (Fansteel Complaint Ex. 2[2]). Several of its provisions have particular relevance here:

2. Jobs filled by employees hired by the Company on or after June 1, 1987 as replacements for striking employees (new hires) shall not be considered vacancies to which returning strikers shall be returned unless and until such jobs are vacated by the strike replacements. Such new hires shall not be bumped or displaced by the return of strikers. Such newly-hired employees shall become members of the Union(s) as stated in the Collective Bargaining Agreement and their respective seniorities shall be measured from their individual hire date.

3. A newly-hired employee shall not be "displaced" or "bumped" as a result of an employee returning to work after an illness or injury leave of absence (industrial or non-occupational). The returning employee may exercise his/her seniority affecting other employees other than those newly-hired and otherwise in conformance with the Collective Bargaining Agreements(s).

\*      \*      \*      \*      \*      \*

---

1. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross motions are involved, that principle demands a dual perspective (which might sometimes cause the denial of both motions). In this instance, however, few facts are in dispute—and

where they are, the ultimate ruling in Fansteel's favor has caused the evidence to be looked at from a pro-Union viewpoint.

2. That exhibit comprises five pages, the last three of which reflect the typed version originally submitted by Fansteel and the first two of which contain handwritten inserts later agreed upon by the parties. This opinion will follow the parties' usage in referring to the numbered paragraphs of Fansteel's draft and the ultimate agreement as "Items."

13. The Company and the Unions, on behalf of themselves and bargaining unit members, agree that no grievances, arbitrations, lawsuits, NLRB unfair labor practice charges, or any other claims shall be filed by the Company against the Unions or by the Unions against the Company concerning any action or omission arising in collective bargaining negotiations or during the period of the strike.

14. The Company and the Unions agree that neither of them shall take any action against an employee because he participated in or failed to participate in the strike.

15. Any dispute arising in the implementation of this Agreement shall be referred to the Grievance Procedure of the new Collective Bargaining Agreement.

Union rejected the draft as tendered. Further negotiations resulted in a number of handwritten changes that found their way into the final Settlement Agreement (the "Agreement"[3]):

1. Draft Items 2 and 3 remained physically in the Agreement, but the parties added this marginal note:

Items 2 and 3 represent the position of the Company and are not agreed to by the Union or waived by the Company.

2. This unnumbered new paragraph was inserted immediately after Item 3:

The rights as stated in items 2 and 3, if any, of the persons put to work after the start of the strike will be determined by mutual agreement of the parties, or the NLRB or an agency or a court of competent jurisdiction subject to all rights of appeal and all applicable rules and regulations of the NLRB or such agencies or courts.

3. Draft Item 13 was deleted entirely.

4. This sentence was added to draft Item 14:

Any action by the Union or any employee taken before the NLRB or court concerning the persons put to work after the start of the strike is not prohibited by this item 14.

5. In Item 15 the word "shall" was changed to "may" and a key addition (indicated by emphasis in the following quotation) was made, so that the final version read this way:

Any dispute arising in the implementation of this Agreement may be referred to the Grievance Procedure of the new Collective Bargaining Agreement *or to other appropriate Governmental Agency.*

Union ended the strike July 11, and the parties entered into two contracts: the new CBA[4] and the Agreement. On July 13 Union filed an unfair labor practice charge with NLRB. On July 15 approximately 30 of the strikers returned to work. That same day Union filed the grievance at issue here, charging (Fansteel Complaint Ex. 5, copied verbatim):

The Company is using new hires (probationary) and salaried personnel to keep it's Union and senior employees from returning to work.

This is a violation of the current collective bargaining agreement, and i in particular, articals 16-6-10- & 22 as well as the letters on pages 111-112-113-118- and 119.[5]

We demand that any employees affected by this violation by compensated for all losses suffered.

Fansteel and Union representatives met July 21. Union spokesman Richard Globis explained that Fansteel was violating the CBA by using new hires classified as Labor Grade 8 to do work that Labor Grade 8 employees could not perform (Award at 7-8). On July 28 Fansteel responded (*id.* at 8):

The Company will classify the "new hires" in the job classifications appropri-

---

**3.** Exhibit 1 to this opinion reproduces the Agreement (Fansteel Complaint Ex. 3).

**4.** According to Award at 7, the new CBA was retroactive to June 1.

**5.** [Footnote by this Court] Those references to contract provisions were to the expired CBA (the new one had not yet been printed). Award at 7 n. * * * says the corresponding page references in the new CBA are pages 80, 81-82 and 87-88.

ate for the work the "new hires" were hired to do and have been performing. This classification will be effective as of the hire date of each of the "new hires," respectively.

Fansteel then upgraded all the replacements in Labor Grade 8 to the next higher grade in each department (either Labor Grade 6 or 5). These upgrades were performed administratively, without any job postings or bidding.

On August 4 Union demanded arbitration of the grievance. On August 28 NLRB's Regional Director dismissed Union's unfair labor practice charge. On April 14, 1988 NLRB's General Counsel denied Union's appeal of that dismissal.

On April 15, 1988 Arbitrator Aaron Wolff conducted the arbitration hearing (the "Hearing"). At the outset Fansteel argued the dispute was not arbitrable (Award at 16):

To the extent that this grievance arises concerning the implementation of the strike settlement agreement, it is clearly arbitrable. However, to the extent that the union is seeking in this grievance the reinstatement of the strikers who were replaced by permanent replacements during the strike, such relief is clearly not authorized by the collective bargaining agreement or strike settlement agreement which expressly recites the parties failure to reach agreement on reinstatement and which expressly provides for a forum to decide that dispute, which would be the National Labor Relations Board and not arbitration.

Therefore, any award of the relief that the union appears to be seeking in this case would be beyond the scope of the collective bargaining agreement and would not be legal and to that extent we believe that what the union is seeking is not authorized by the collective bargaining agreement.

We are willing to let the arbitrator make that determination in the first instance. However, we want to make it clear that we are in no way submitting to the arbitrator the question of the lawfulness of the union's [sic] hiring permanent re-

placements, which is an issue for the National Labor Relations Board.

Fansteel then proceeded with the Hearing and addressed the merits of Union's claim.

In part Arbitrator Wolff's comprehensive opinion said (Award at 15):

While it is no doubt true that courts may have the final say on the substantive arbitrability, a party may raise this issue before an arbitrator without waiving its right to court review of that issue at least where, as here (R. 5–6), the party stakes out its position or objection at the outset of the arbitration hearing.

After rejecting Union's waiver argument, the Arbitrator identified the issues Union had submitted to arbitration in these terms (*id.* at 19–20):

1. Did the Company violate the CBA in the manner in which it used the new hires after the strike was over and before it reclassified them?

2. Did the Company violate the CBA or the SSA in the manner in which it reclassified and upgraded the new hires on or about July 28?

3. Did the Company, after the strike was over and the CBA was in effect, use foremen to perform bargaining unit work in violation of the CBA?

4. If the Company did violate provisions of the CBA or the SSA, what remedies are appropriate under the circumstances?

Then Arbitrator Wolff held those issues arbitrable under CBA Art. 13 and Agreement Item 15 (*id.* at 20) and proceeded to the merits.

As to the substantive issues, the Arbitrator found for the Union in all respects:

1. He found the new hires were performing work outside of their job classifications.

2. He found Fansteel had violated the CBA and the Agreement when it unilaterally upgraded the replacements.

3. He found Fansteel had also violated the CBA by using foremen to perform

bargaining unit work.[6]

By way of remedy, Arbitrator Wolff ordered Fansteel to post for bidding all job positions into which Fansteel had upgraded the replacements. Employees entitled to those positions were to "be made whole for any loss of earnings sustained" (Award at 40). Finally, the foremen were ordered to stop performing bargaining unit work.

### Positions of the Parties

Fansteel advances a multi-pronged attack on the Award:

    1. It should be vacated because the grievance was not arbitrable.

    2. Alternatively it should be vacated because it does not draw its essence from the parties' agreement.

    3. Its mandated remedy exceeded the Arbitrator's authority.

Union responds in these terms:

    1. Fansteel waived the arbitrability issue by proceeding with the Hearing.

    2. Even apart from any arguable waiver, the dispute is arbitrable.

    3. Both the Award and the remedy draw their essence from the parties' agreement.

    4. Rule 11 sanctions should be imposed on Fansteel for challenging the Award.

This opinion necessarily deals with the arbitrability question at the outset.

### Is the Dispute Arbitrable?

Any discussion of arbitrability must begin with the seminal case in the area, *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Drawing upon the *Steelworkers Trilogy* principles, *AT & T Technologies, id.* at 649, 106 S.Ct. at 1418, citations omitted, left no doubt as to who is to decide arbitrability:

> [T]he question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. Un-

less the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.

Most frequently a party who claims a dispute is not arbitrable will refuse to proceed with the arbitration hearing. That forces the other party to file suit and to obtain, consistently with *AT & T Technology*'s teaching, a court determination as to arbitrability. If the court finds the dispute subject to arbitration, it can then compel the party opposing arbitration to proceed with that remedy.

Fansteel took a different route. It specifically urged Union's dispute was not arbitrable. It nevertheless proceeded with the arbitration hearing, allowing the Arbitrator to decide arbitrability in the first instance (but clearly indicating it was not waiving its right to a later court determination). Union Mem. 5 says that by proceeding in that manner Fansteel has "waived its right to contest arbitrability in this Court."

But the case law uniformly rejects any such notions of waiver. Though our own Court of Appeals has never addressed the issue directly, this Court will of course treat with the message gleaned from Seventh Circuit opinions before turning elsewhere.

Two Seventh Circuit statements, albeit in dicta, clearly convey the message that a party can proceed with an arbitration hearing while reserving the arbitrability issue for later court determination. *Jones Dairy Farm v. Local No. P–1236, United Food and Commercial Workers International Union, AFL–CIO*, 760 F.2d 173 (7th Cir. 1985) held an employer had waived the arbitrability issue by proceeding with the hearing without protest. But in the course of that decision the court said (*id.* at 175):

> But Jones Dairy Farm did not make it [arbitrability] an issue. It did not, while agreeing to participate in the arbitration, challenge the arbitrator's jurisdiction,

---

**6.** Fansteel does not challenge this finding (Fansteel Mem. 1 n. 1). Accordingly this third issue

is not before this Court.

and make clear it was preserving its challenge for eventual presentation to a court if the arbitrator ruled in union's favor, as in *Wilkes–Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre, Local 120,* 647 F.2d 372, 382 (3d Cir.1981). See Gorman, Basic Text on Labor Law 587 (1976). The company never questioned the arbitrator's authority.

If a party voluntarily and unreservedly submits an issue to arbitration, he cannot later argue that the arbitrator had no authority to resolve it.

Just one year later *Dreis & Krump Manufacturing Co. v. International Association of Machinists and Aerospace Workers, District No. 8,* 802 F.2d 247 (7th Cir. 1986) again found a waiver in the employer's having failed to reserve arbitrability. And once again the court said (*id.* at 252):

> [B]y consenting to submit the grievance to arbitration without any reservations, the company waived the argument that is the premise of its suit—that the arbitrator acted outside of his jurisdiction. The company's argument on the merits is that the management-rights clause in the collective bargaining agreement is so broad that it makes a decision to subcontract work nonarbitrable. But if this is so the company should either have refused to arbitrate the dispute, thus forcing the union to bring a suit to compel arbitration—a suit in which the district court would decide the issue of arbitrability—or have submitted to arbitration under protest. By failing to do either of these things it admitted that the subject of subcontracting was within the scope of the clause. See *Jones Dairy* ... and cases cited there; *Teamsters Local Union No. 764 v. J.H. Merritt & Co.,* 770 F.2d 40, 43 (3d Cir.1985).

Those cases reflect the same principle as do square holdings from at least one Court of Appeals (*Wilkes–Barre,* cited in *Jones Dairy,* and other Third Circuit cases cited

at 647 F.2d at 382) and several District Courts as well (see, e.g., *Northwest Airlines, Inc. v. International Association of Machinists and Aerospace Workers, Air Transport District Lodge No. 143,* 1988 U.S.Dist. LEXIS 14198, at 11–13 (D.Minn.) [1988 WL 134701]; *R.W. Granger & Sons, Inc. v. Eastern Massachusetts Carpenters and Carpenters Local 275 of the United Brotherhood of Carpenters and Joiners of America,* 686 F.Supp. 22, 25–26 (D.Mass. 1988)), as well as dicta elsewhere (see, e.g., *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Independent Truck Drivers Union, Local No. 1,* 611 F.2d 580, 584 (5th Cir.1980); *International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 117 v. Washington Employers, Inc.,* 557 F.2d 1345, 1350 (9th Cir.1977)).[7] And that view is shared by commentators (see Elkouri and Elkouri, *How Arbitration Works* 220–21 (4th ed.1985); Fairweather, *Practice and Procedure in Labor Arbitration* 132 (2d ed.1983)).

Both Seventh Circuit dicta antedated *AT & T Technologies,* and the same is true of the other just-cited Court of Appeals decisions and treatises. But the principle they enunciate is not adversely impacted by the result in *AT & T Technologies,* so the line of authority they exemplify seems unimpaired.

■ There are, to be sure, some disquieting aspects of that notion—aspects that seem not to have been fully aired by the opinions voicing it.[8] But given the clear existing signals from our Court of Appeals, it would be entirely unfair to change the rules on Fansteel now. After all, the very reason that continuity is important in the law—the underlying reason for the whole concept of following precedent—is to assure predictability for the consequences of a party's conduct. Where Fansteel has followed the path specifically marked out

---

**7.** Not surprisingly, a like dictum has also emanated from the one Court of Appeals that has decided the issue squarely (*Teamsters Local Union No. 764 v. J.H. Merritt and Co.,* 770 F.2d 40, 43 (3rd Cir.1985) (quoting *Jones Dairy* )).

**8.** See discussion in the Appendix.

by the highest legal authority in whose jurisdiction it functions, it should not now be told it was following a false prophet and has waived the right it so carefully sought to preserve. Little wonder that Arbitrator Wolff himself found Union's waiver argument unpersuasive (Award at 15, quoted in the "Facts" section of this opinion). This Court agrees.[9]

This opinion therefore turns to an independent evaluation of the arbitrability issue. *AT & T Technology*, 475 U.S. at 650, 106 S.Ct. at 1419 (citations omitted) summarizes the controlling standards for courts asked to decide whether a particular dispute is arbitrable:

> Finally, it has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."...Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder...." In such cases, "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

Two potential sources of arbitrability exist here—the CBA and the Agreement. CBA Article 13 provides (Fansteel Complaint Ex. 4, at 43, 45):

> Should any employee feel aggrieved by any matter arising out of his employment by the Company, or should any differences arise between the Company and the Union

> (a) as to the meaning and application of any of the provisions of this Agreement, or

> (b) respecting any other matter relating to rates of pay, wages, hours or other conditions of employment affecting the employees of the Company

> an earnest effort shall be made by all of the parties to settle such grievances or differences promptly by means of the following procedure, and there shall, under no circumstances, be any suspension of work on account of such grievances or differences.

> \*    \*    \*    \*    \*    \*

> **Step 4**
> If the decision rendered by the Director of Industrial Relations is not productive of a satisfactory settlement, the controversy shall be submitted to arbitration. Within ten (10) working days after receipt of such request and the naming of an arbitrator by the party initiating the arbitration, the other party shall by notice in writing to the party seeking arbitration designate a second arbitrator. The two (2) arbitrators so designated by the parties shall meet promptly and agree upon a third arbitrator and shall proceed with all reasonable expedition to decide the controversy. The decision of the majority of the three (3) arbitrators so designated shall be binding on both parties.

And as quoted earlier, Agreement Item 15 says:

> Any dispute arising in the implementation of this Agreement may be referred to the Grievance Procedure of the new Collective Bargaining Agreement or to other appropriate Governmental Agency.

CBA Article 13 is the classic arbitration clause—all-encompassing ("any matter" or "any differences") and providing an exclusive remedy. Agreement Item 15 is not—though it does extend to "any dispute," it (especially taken in context) plainly contemplates that some disputes will be referable to arbitration while others will not.

---

**9.** This holding obviates the need to address another question: What would be the appropriate standard of review of the arbitrator's decision on arbitrability? On that issue, see the general discussion in *Jones Dairy*, 760 F.2d at 176.

That being the case, *AT & T Technologies* teaches any matter to which the CBA applies is entitled to a "presumption of arbitrability" and any "[d]oubts [are] resolved in favor of coverage." Certainly such presumption and doubt-resolution, if applicable at all, would appear less strong to the extent that Agreement Item 15 is the potential source under examination. Nonetheless Union will be given the benefit of the doubt even in that respect, and this opinion will proceed on the premise that the disputes in issue are nonarbitrable *only* if:

1. the Agreement contains an express provision excluding the grievance from arbitration or

2. the Agreement provides the "most forceful evidence" of a purpose to exclude.

Fansteel appears to contend the Agreement meets both those *AT & T Technologies* alternatives. Its R.Mem. 6 says the previously-quoted paragraph inserted below Agreement Item 3 constitutes an express exclusion:

> The rights as stated in items 2 and 3, if any, of the persons put to work after the start of the strike will be determined by mutual agreement of the parties, or the NLRB or an agency or a court of competent jurisdiction subject to all rights of appeal and all applicable rules and regulations of the NLRB or such agencies or courts.

Fansteel Mem. 8 says arbitration was purposely not added to that paragraph because "there was no agreement on the issues described in Item 2, and therefore nothing for an arbitrator to apply." To support its position Fansteel also points to the earlier-quoted final language of Agreement Item 15 and then says (Mem. 10):

> On its face, the Strike Settlement Agreement clearly reserves for the NLRB or courts, and removes from arbitration, any claim that would jeopardize the replacements' status as permanent, either by claiming that the replacements' positions constitute vacancies, or by seeking that replacements be bumped or displaced by strikers.

■ No doubt the Agreement was inartfully put together in the pressure cooker of final negotiation—it was a patchwork quilt of marginal notations and handwritten paragraphs marked for insertion, rather than the seamless web that might be hoped for from teams of lawyers working in their office environments, with ready access to word processors and with the time and capacity for extended review and editing. But its message comes through loud and clear: Claims or disputes involving the rights of the replacement workers are *not* to be arbitrated under the CBA's grievances. That is best demonstrated and understood by reviewing the bidding in the negotiations ending the strike.

In its initial draft Agreement Fansteel sought to destroy Union's position as to the new hires. Its Items 2 and 3 would have insured that those replacements would not be replaced by returning strikers.

Union balked at that unconditional-surrender position. It understandably wanted Fansteel to terminate or lay off the replacements to make room for the strikers. When Fansteel in turn rejected that polar-opposite stance, the parties agreed to disagree. Enter the two new inserts—the marginal note opposite Items 2 and 3 and the paragraph following Item 3:

1. As for the marginal note, it expressly said Items 2 and 3 remained Fansteel's position but were flatly opposed by Union.

2. Then the newly-inserted paragraph defined the procedural mechanism for resolving the total disagreement over Items 2 and 3. It may fairly be paraphrased, without any alteration in meaning, in these terms:

> If the replacements have any rights (and Union doesn't agree that they do), those rights will be decided in any one of three ways:
>
> (a) by mutual agreement between Fansteel and Union;
>
> (b) by the NLRB or other agency; or
>
> (c) by a court.

Grievance and arbitration are conspicuously absent from that list of avenues for resolving the respective rights of the new

hires and the returning strikers. In the circumstances, that is just as express an exclusion as if the words "but not grievance and arbitration" had been coupled with the designation of the three available routes. And that clear reading is buttressed by at least two other changes in the Agreement.[10]

First, draft Item 14 originally read (Fansteel Complaint Ex. 2):

The Company and the Unions agree that neither of them shall take any action against an employee because he participated in or failed to participate in the strike.

In the final version the parties added this sentence (*id.* Ex. 3):

Any action by the Union or any employee taken before the NLRB or court concerning the persons put to work after the start of the strike is not prohibited by this item 14.

That sentence, which centers on the rights of the replacement workers, again omits any reference to grievance and arbitration. Thus Item 14 too permits claims by Union or any employee, but *only* before NLRB or a court.

Finally, because the inserted paragraph had addressed the *procedures* available to resolve the open substantive dispute over the respective rights of the two groups, a corresponding change was necessary—and was made—in Item 15. Initially draft Item 15, then part of a document that nailed down the coffin on any claim of returning strikers to bump the new hires, had committed the resolution of any disputes under the Agreement to the grievance and arbitration machinery of the new CBA. But with the rights of the contending groups

now left unresolved, and with the mechanisms for resolving those rights now being specified as everything *but.* grievance and arbitration, the final form of Item 15 was changed to say that disputes under the Agreement:

may be referred to the Grievance Procedure of the new Collective Bargaining Agreement or to other appropriate Governmental Agency.

Again there is only one obvious reason for changing the "shall" to "may" and adding the phrase "or to other appropriate Governmental Agency": As a result of the insert following Items 2 and 3, the grievance-arbitration route was no longer the sole method of dispute resolution. Because that was so, the remedies provision of Item 15 had to be altered to specify another available path: resort to an "appropriate Governmental Agency." [11]

Thus Item 15, in its final version, meshes perfectly with the Agreement's new paragraph following Item 3. Disputes as to the replacement employees are *not* arbitrable, but instead—if not resolved by the parties' mutual agreement—must be tendered to NLRB or directly to the courts (whichever is the "appropriate Governmental Agency"). Indeed, no other reading of the Agreement gives effect to *all* its provisions.

In sum, the paragraph inserted after Item 3 is an express provision excluding from CBA grievance and arbitration all disputes about the replacement workers. Union agreed to that provision and must now live with the consequences. And a reading of the entire Agreement in the context of the bargaining history presents "forceful

---

10. In addition to the two changes next discussed in the text, draft Item 13—deleted from the final Agreement—must also be viewed as significant. In itemizing the avenues that Fansteel and Union could not pursue after the strike, Fansteel-proposed Item 13 specifically referred to grievance and arbitration as well as to lawsuits and NLRB unfair practice charges. That being so, it can scarcely be viewed as accidental that the parties' negotiated insert that followed Item 3 in the ultimate Agreement referred to the latter two avenues of possible remedy but *not* to grievance or arbitration. That omission parallels the

omission from Item 14, discussed in the next paragraph of the text.

11. "Governmentai Agency" may seem an odd locution to describe the possibility of going to the *courts* as well as NLRB. But when juxtaposed to the private remedy involved in resorting to a grievance procedure followed by a parties-selected arbitrator, the labor negotiators' choice of "Governmental Agency" to lump two governmental labor-dispute resolvers (courts and NLRB) is not quite as peculiar as it strikes a judge—or lawyer—on first reading.

evidence of a purpose to exclude the claim from arbitration" (*AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. at 1419).

It remains only to consider whether the grievance submitted to the Arbitrator in fact concerned the rights of the new hires. If so, the Agreement makes it nonarbitrable.

■ That question requires little discussion. Fansteel challenges the Arbitrator's first two conclusions here:

1. that Fansteel violated the CBA by using the replacement workers outside of their assigned labor grade and

2. that Fansteel also violated the CBA when it unilaterally reclassified and upgraded the replacements.

Both those issues clearly involve "the rights as stated in items 2 and 3, if any, of the persons put to work after the start of the strike" (the stated scope of the inserted paragraph): They directly address the availability of jobs for the new hires vis-a-vis the strikers. It will be recalled that Union returned from the strike and immediately challenged the manner in which Fansteel was utilizing the replacements. Union's central claim was that lower labor grade replacements were assigned to do work normally performed by higher rated employees in an attempt to prevent strikers from returning.

Fansteel responded that the replacements were always doing the same work and that if Union's grievance centered on out-of-classification violations, Fansteel would remedy that by retroactively upgrading the employees. It was at that point that Union contended the upgrading also violated the CBA.

This Court is of course mindful of the admonition in *AT & T Technologies,* 475 U.S. at 649, 106 S.Ct. at 1419:

[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.

No effort has been made here to delve into the merits of the underlying dispute. Instead this opinion has examined the issues submitted by Union, as framed and analyzed by the Arbitrator, and concludes they directly involve the rights of the replacement workers. As such they are excluded from arbitrability by the Agreement.[12]

### Rule 11

■ Union Mem. 13 says sanctions are warranted against Fansteel under Rule 11. Even had this Court reached a conclusion opposite to that reflected by this opinion, the substantial body of authority supporting Fansteel's reservation of the arbitrability issue and the nature of the substantive case law as to arbitrability would have precluded any potential for finding a Rule 11 violation.

Quite the contrary is true. Union's brief (only one page) and ill-considered Rule 11 motion—symptomatic of the infectious sanctions-seeking disease that threatens to reach epidemic proportions in the legal profession—is itself suspect (see *Foy v. First National Bank of Elkhart,* No. 88–2264, 868 F.2d 251, 258 (7th Cir.1989) ("A frivolous request for sanctions is itself sanctionable").

This should not be mistaken as an invitation to Fansteel. Union's motion is denied, and no cross-motion by Fansteel will be entertained.

### Conclusion

As in the situation recently presented to our Court of Appeals in *International Association of Machinists and Aerospace Workers, Progressive Lodge No. 1000 v. General Electric,* 865 F.2d 902 (7th Cir. 1989), the parties here clearly contracted to exclude from arbitration the very dispute that Union has tendered to the Arbitrator. There is no genuine issue of material fact as to any of the questions posed in these two cases. Except to the extent stated in the next paragraph, Fansteel is entitled to a judgment as a matter of law in each case.

---

**12.** This conclusion makes it unnecessary to consider Fansteel's two remaining arguments: that the Award does not draw its essence from the Agreement and that the remedy exceeded the Arbitrator's authority.

In Case No. 88 C 9091 the portions of the Award challenged by Fansteel—the entire Award except the portion that finds foremen had performed bargaining unit work in violation of the CBA—are vacated. In Case No. 88 C 9147 Union is denied enforcement of the Award except with respect to that same finding as to the foremen. Union's Rule 11 motion is denied in both cases.

## EXHIBIT 1

### Strike Settlement Agreement

#### Between

Fansteel Inc., (hereinafter called the "COMPANY") and Local Lodge 1777 International Association of Machinists and Aerospace Workers AFL-CIO; Local Union No. 93 of the United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada; Local Union 150 of the International Brotherhood of Electrical Workers; and Lake County Local Union No. 250 of the International Brotherhood of Carpenters & Joiners of America (hereinafter called the "UNIONS");

WHEREAS, the parties hereto are about to execute Collective Bargaining Agreement(s) effective June 1, 1987.

NOW, THEREFORE, in consideration of the execution of the said Collective Bargaining Agreement(s), the parties have executed this Agreement to become effective concurrently with the new Collective Bargaining Agreement(s).

1. The strike against Fansteel Inc. by the Company's employees who are members of one of the Unions is terminated as of the date of this Agreement. Striking employees shall be returned to work to openings in the classifications occupied by the employee on May 31, 1987, in accordance with their respective seniority, and the recall provisions of the Collective Bargaining Agreement(s) shall determine the order of return to work.

2. Jobs filled by employees hired by the Company on or after June 1, 1987 as replacements for striking employees (new hires) shall not be considered vacancies to which returning strikers shall be returned unless and until such jobs are vacated by the strike replacements. Such new hires shall not be bumped or displaced by the return of strikers. Such newly-hired employees shall become members of the Union(s) as stated in the Collective Bargaining Agreement and their respective seniorities shall be measured from their individual hire date.

3. A newly-hired employee shall not be "displaced" or "bumped" as a result of an employee returning to work after an illness or injury leave of absence (industrial or non-occupational). The returning employee may exercise his/her seniority affecting other employees other than those newly-hired and otherwise in conformance with the Collective Bargaining Agreement(s).

The rights as stated in items 2 and 3, if any, of the persons put to work after the start of the strike will be determined by mutual agreement of the parties, or the NLRB or an agency or a court of competent jurisdiction subject to all rights of appeal and all applicable rules and regulations of the NLRB or such agencies or courts.

4. Employees who prior to the strike were employees of the Company but subsequent to the strike have resigned or retired shall not be returned to work.

5. It is recognized that all employees may not be returned to work at the same time or on the same date.

6. A designated representative of the Unions and a designated representative of the Company shall work together to notify employees of the end of the strike and the date and time when each returning employee is to report to work.

7. All grievances filed and unresolved during the term of the Collective Bargaining Agreement dated effective June 1, 1984, will be honored by the Company and shall be processed in accordance with the terms of the Collective Bargaining Agreement dated effective June 1, 1984.

8. The Seniority Dates of striking employees shall remain the same as were recorded on the records of the Company on May 31, 1987.

9. Striking employees shall not be compensated in any form for the time on strike.

10. For purposes of the establishment of seniority as an employee of the Company, or for purposes of progression within the rate range of a job, the period of the strike shall be excluded. For example, if an employee had ten days remaining of his "Probationary Period" on May 31, 1987, he shall have ten days remaining of his "Probationary Period" as of the date he returns to work. The "Probationary Period" for newly-hired employees shall be measured from the date this Agreement is executed, provided, however, they shall not be deemed to be probationary employees for purposes of Article 10, Section F of the new Collective Bargaining Agreement.

11. The Company shall reinstate the group insurance program for returning striking employees who did not keep their insurance in force effective on the date of return. Those returning employees who have kept their insurance by paying the premium for it will receive a refund of the excess premium they have paid (dependants and employee coverage). The excess premium covers the period after the striking employee returns to work. Those employees not returning who have kept their insurance by paying the premium for it remain insured by continuing to pay the premium for it.

12. Employees who requested and received vacation pay for vacations earned May 31, 1987, to be taken on or after June 1, 1987, shall be deemed to have taken their vacation for the vacation year starting June 1, 1987, provided such an employee who was eligible for more than two weeks vacation will be permitted to take up to an additional two weeks of vacation without pay.

14. The Company and the Unions agree that neither of them shall take any action or discriminate against an employee because he participated in or failed to participate in the strike. Any action by the Union or any employee taken before the NLRB or court concerning the persons put to work after the start of the strike is not prohibited by this item 14.

15. Any dispute arising in the implementation of this Agreement may be referred to the Grievance Procedure of the new Collective Bargaining Agreement or to other appropriate Governmental Agency.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto in the City of Waukegan, Illinois, this ___11th___ day of ___July___, 1987.

LOCAL LODGE 1777

LOCAL UNION 93

_____

_____

_____

LOCAL UNION 150

_____

_____

LOCAL UNION 250

FANSTEEL INC.

_____

_____

_____

_____

-

_____

## APPENDIX

As this opinion reflects, the authorities—including two dicta from our Court of Appeals—support the result followed in the text, allowing a party simultaneously to reserve its objections to arbitrability while proceeding on the merits before the arbitrator. But that doctrine is troublesome in analytical terms, and this Appendix therefore addresses an aspect not really confronted by the controlling authorities and the commentators in the area.

We begin with the premise now established by *AT & T Technologies:* Courts and not arbitrators are to decide the underlying question of arbitrability. That means an arbitrator's determination that a dispute is arbitrable, arrived at en route to deciding that dispute on the merits, is subject to a wholly fresh judicial look, unfettered by the constraints imposed on judicial review of arbitrators' decisions on the merits.

But the duty to arbitrate is of contractual origin (*AT & T Technologies,* 475 U.S. at 649, 106 S.Ct. at 1419), and parties are surely free to contract away their right to a judicial determination of whether that duty exists. Even if parties have not committed themselves in writing to the arbitra-

tion of certain questions, they are surely free to submit even the arbitrability issue to the arbitrator should they so choose (see, e.g., *Johnson v. United Food and Commercial Workers, International Union Local No. 23,* 828 F.2d 961, 964–65 (3d Cir.1987)). And that being so, there seems little reason in principle to give a party the opportunity to ask for an arbitrator's decision on the merits while holding in reserve the underlying arbitrability question if the merits argument proves unpersuasive.

Some authorities justify that result by analogy to subject matter jurisdiction. Arbitrators, like federal judges, have limited spheres of decision. Our charter is what Article III and Congress have conferred, while theirs is what the parties have conferred by contract. And so it is, for example, that Fairweather, *Practice and Procedure in Labor Arbitration* 132 (footnote omitted) puts the matter in these terms:

Since the issue of nonarbitrability goes to the issue of the arbitrator's jurisdiction, the better rule would appear to be that participation in the arbitration does not constitute a waiver. Such a rule would conform to the general judicial

rule that lack of subject-matter jurisdiction is never waived.[1]

But that draws on a false analogy. As any first-year law student knows, subject matter jurisdiction is not waivable. Every court is obligated to dismiss a case on its own motion if it discovers it lacks subject matter jurisdiction. And if a court proceeds in the absence of jurisdiction, what it does is a nullity—it may be undone by that court itself, or on the motion of the losing (or, for that matter, the winning) litigant, or by a reviewing court, either at the behest of a party or on *its* own motion (see, e.g., *Ross v. Inter–Ocean Insurance Co.,* 693 F.2d 659, 663 (7th Cir.1982)). No consent by a litigant can cure an absence of subject matter jurisdiction.

That is not at all true of the arbitration situation, else (for example) such cases as *Dreis & Krump* would not be examining whether a party had "waived" the argument of the arbitrator's lack of authority "by consenting to submit the grievance to arbitration without any reservations" (802 F.2d at 252).[2] And what that means is that the doctrine under examination here gives only one side the ability to challenge the arbitrability issue. Here Union invoked the arbitration process by submitting the grievance to arbitration. Under the *Jones Dairy–Dreis & Krump* analysis, it waived any objection to arbitrability. Had it lost before the arbitrator, then, it could not have then come before this Court and advanced Fansteel's current position—that the dispute was not arbitrable (and hence should be decided by some other authority in the first instance).

Because the rule thus cannot find its support in principles of jurisdiction, some other policy justification must be identified.

One obvious candidate is the potential conservation of resources—perhaps what Judge Posner alluded to in *Jones Dairy,* 760 F.2d at 175:

> It is desirable to put as much of the case as possible to the arbitrator, and not encourage parties to go to court before the arbitration can begin.

Indeed, Union Mem. 6 grants some force to preserving the arbitrability objection while simultaneously proceeding with the hearing:

> That procedure may have merit. In theory, an insubstantial grievance could be disposed of in arbitration in less time and for less money than it would take to establish in court that it was not arbitrable.

But any such saving of resources presumes victory on the merits by the party challenging arbitrability. If that party *loses* before the arbitrator, it will go directly to court to challenge the arbitrability decision. And if that challenge proves successful, instead of any conservation of resources there will have been a *waste* of resources: All that has taken place before the arbitrator will have gone for naught.[3]

As against the prospect of a sometimes-realized conservation of resources by permitting the reservation of the arbitrability issue while going to the arbitration mat on the merits, it is hard to ignore the inherent unfairness in allowing a party thus to engage in a "heads I win, tails you lose" game. It certainly seems inequitable to allow Fansteel to object to arbitrability and still proceed with the merits of the dispute: If it wins on the merits, it will cheerfully forget its argument that the matter should

---

1. See generally *Local 719, American Bakery and Confectionery Workers of America, AFL–CIO v. National Biscuit Co.,* 378 F.2d 918, 921 (3d Cir. 1967).

2. True enough, *Dreis & Krump* (and *Jones Dairy* too) use the word "jurisdiction" in referring to the arbitrator's authority to decide a dispute. But that must be viewed as merely a convenient shorthand for the arbitrator's absence of power to resolve the issue unless the parties agree *or* are barred (say by waiver) from challenging that power. Mutual agreement may be viewed as the parallel of subject matter jurisdiction in the limited sense that the parties' agreement is the very fount of the arbitrator's power, but waiver cannot claim such a parallel.

3. This may be a slight oversimplification. In some cases it is possible that an arbitrator's first crack at the issues could facilitate the court's resolution of the arbitrability question, as by framing the issues with the benefit of any special expertise the arbitrator may bring to the table. But that possibility is speculative at best.

never have gone to the arbitrator in the first place—while if it loses on the merits it remains free to urge that argument on a court with full vigor and to obtain a de novo judicial decision on that issue and, even more importantly, to get a fresh shot at the merits as well. Thus to focus on the merits alone, had Fansteel won on those issues it would derive the benefit of the narrow judicial review accorded to arbitrators' decisions on the merits, but its loss on the merits has subjected it to none of the disadvantages of limited judicial review.

On the other side of the coin, Union enjoys no such luxury. Because it brought the issues to the arbitrator in the first instance, a loss before the arbitrator on the merits would leave it entirely bound on the arbitrability question and also seriously bounded by the scope of judicial review on the substantive issues. Conversely, an arbitral victory on the merits would leave it vulnerable to de novo judicial review on the arbitrability question *and*, if it were to lose that, on the merits issues as well.

It could be said, of course, that Union's course of action was entirely volitional, and that in free-market terms it cannot complain of the consequences of its choice. But that result, if generally understood, would surely lead to fewer submissions to arbitrators whenever any doubt exists as to arbitrability. And that in turn is at odds with the strong public policy favoring arbitration (see *IAM v. General Electric*, 865 F.2d 902, at 903–04). Such a result hardly "furthers the national labor policy of peaceful resolution of disputes" (*AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419, quoting *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 371–72, 104 S.Ct. 1844, 1849, 80 L.Ed.2d 366 (1984)) or is consistent with "the longstanding federal policy of promoting industrial harmony through the use of collective-bargaining agreements" (*id.*, 475 U.S. at 651, 106 S.Ct. at 1420).

Were this Court writing on a clean slate, it would therefore hold no party should be free to go to arbitration on the merits while holding in reserve an argument of nonarbitrability. Whatever the initial scope of the parties' agreement to arbitrate may have been, if both thereafter pose an issue for decision by the arbitrator they should be held to have regarded that issue as within that scope—or alternatively to have enlarged the scope to embrace that issue. Such a rule, under which a party would understand that as the necessary consequence of any submission of a merits issue to the arbitrator, would do no violence to the teaching of *AT & T Technologies*, 475 U.S. at 649, 106 S.Ct. at 1418 (citations omitted):

> Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.

As the text of this opinion reflects, to impose such a rule on Fansteel in the first instance would work a serious injustice—it would defeat justifiable expectations based on what courts had said about the matter earlier. And although the concept of avoiding advisory opinions is on the whole a salutary one (even apart from the jurisprudential principles of justiciability that are embodied in the "case or controversy" limitation), unless a different substantive rule were to be announced only prospectively the law in this area could never change without inflicting a like undeserved wound on some litigant in whose case the new rule was announced.

There is some precedent for the judicial announcement of rules to take effect in the future rather than in the case at bar. But that notion is obviously not one for a district court to adopt—its decisions do not serve as precedents (see, e.g., *Mayo v. Lane*, 867 F.2d 374, 376 (7th Cir.1989)). Accordingly this Appendix—by definition a dictum, as were our Court of Appeals' discussions in *Jones Dairy* and *Dreis & Krump*—is written in hope that some higher authority may take an appropriate occasion at least to consider the promulgation of a different substantive rule for the reasons articulated here.