**CHICAGO WEB PRINTING PRESSMEN'S UNION, NO. 7, Plaintiff-Appellant,**

v.

**CHICAGO NEWSPAPER PUBLISHERS' ASSOCIATION, Defendant-Appellee.**

No. 84–2720.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1985.

Decided Sept. 12, 1985.

Sheldon M. Charone, Carmell, Charone & Widmer, Ltd., Chicago, Ill., for plaintiff-appellant.

Joel H. Kaplan, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellee.

Before ESCHBACH and FLAUM, Circuit Judges, and GIBSON, Senior Circuit Judge.*

FLAUM, Circuit Judge.

Plaintiff-appellant Chicago Web Printing Pressmen's Union No. 7 (the "Union") appeals from the district court's affirmance of an arbitrator's decision in favor of the Chicago Newspaper Publishers' Association (the "Association"). The Association member involved in this suit is the Chicago Tribune (the "Company"). The Union contends that the arbitrator exceeded his authority when he held that the Company did not violate the parties' collective bargaining agreement by unilaterally discontinuing a long-established seniority system. We affirm the district court's affirmance of the arbitrator's decision.

## I.

For over thirty years, the Company and the Union operated under an unwritten "dual chapel" seniority system in which employees acquired and maintained seniority within separate day and night chapels. Employees were not permitted to transfer between chapels; if a day employee wanted to work in the night chapel, for instance, he would have to terminate his employment with the Company and apply for a position in the night chapel. Employees who left one chapel for another lost any seniority that they had accumulated in their previous chapel.

In 1979, the parties began negotiating what would be their collective bargaining agreement for the next six years. Although there was some discussion during these negotiations as to whether dual chapel seniority should be eliminated, the final collective bargaining agreement was silent on the issue of how seniority was to be determined.

In September 1982, the Company moved its press room facilities to a new building. The Company had used "letter presses" at its old facility, which pressmen everywhere knew and had been trained to operate. At the new facility, the Company installed new "offset presses," which required extensive retraining of even the Company's best pressmen. The Company believed that the dual chapel system precluded it from coordinating effective working crews, selecting the most qualified pressmen to be in charge of the crews, and keeping trained crews intact. The Company therefore entered into talks with the Union, continuing from September 1982 to March 1983, in an attempt to abolish the dual chapel seniority system.

The Union was apparently faced with conflicting interests among different chapel members, so opted to retain the status quo. When the Company was unable to reach agreement with the Union after six months of talks, the Company posted a notice informing the employees that their seniority would thereafter be determined on a company-wide basis.

The Union filed a grievance against the Company, alleging that the Company's unilateral action violated a longstanding practice that had in effect become part of the collective bargaining agreement. The

---

* The Honorable Floyd R. Gibson, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

**386**

grievance was submitted for arbitration. On April 24, 1983, the arbitrator denied the Union's grievance, holding that the Company did not violate the collective bargaining agreement when it instituted a company-wide seniority system without regard to day or night chapels. The arbitrator reasoned that even though the dual chapel seniority system was an established past practice, such practices can be changed either by a clause to the contrary in a collective bargaining agreement or unilaterally by either party when the conditions upon which the practice was based are substantially changed or eliminated. The arbitrator first concluded that the parties had not agreed to eliminate dual chapel seniority in their 1979 negotiations. He then found that the second justification applied in this case for two reasons: first, the lifetime job guarantees contained in the parties' 1979 agreement would be less than effective if an employee could lose his guarantee simply by moving from one chapel to another, and second, the Company's move to the new facility necessitated greater flexibility and continuity in press crews. The arbitrator thus concluded that there was a change in conditions sufficient to allow the Company unilaterally to eliminate dual chapel seniority.

The Union filed a complaint seeking to set aside the arbitrator's award in the United States District Court for the Northern District of Illinois on July 14, 1983. The Union and the defendant Association (on behalf of the Company) both moved for summary judgment. The district court granted the Association's motion for summary judgment on August 24, 1984, noting the limited scope of review of arbitrators' decisions and concluding that the arbitrator in this case had acted within the scope of his authority in holding that the Company had not violated the collective bargaining agreement. The court accordingly affirmed the arbitrator's decision.

## II.

■ The scope of judicial review of an arbitrator's award is confined to the nar-row question of whether the award "draws its essence from the collective bargaining agreement." *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); *W.R. Grace & Co. v. International Union of the United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983); *Amoco Oil Co. v. Oil, Chemical & Atomic Workers International Union*, 548 F.2d 1288, 1293–94 (7th Cir.), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977). If an award satisfies this requirement, courts are bound to enforce the award and may not review the merits of the contract dispute. *W.R. Grace*, 461 U.S. at 764, 103 S.Ct. at 2182. Neither the correctness of the arbitrator's conclusion nor the reasoning employed to reach that conclusion is relevant to the reviewing court. *Amoco Oil*, 548 F.2d at 1294.

■ The Union contends that the arbitration award in question did not draw its essence from the parties' collective bargaining agreement in several respects. The Union first argues that the arbitrator went beyond the question submitted for arbitration. The parties did not, either orally or in writing, agree to a formal submission for the arbitrator. The Union's position before the arbitrator was that the only way to alter an established past practice was through express negotiation, and that the parties did not agree in their 1979 negotiations to eliminate dual chapel seniority. The Company's position was twofold: first, that the parties had agreed to abolish dual chapel seniority in 1979, and second, that the conditions giving rise to the dual chapel system no longer existed. The Union now argues that because counsel for the Company, in conjunction with the Company's first argument, avowed that the Company was "not seeking to secure through arbitration that which it was not able to secure through negotiations," the question submitted to the arbitrator was limited to whether the parties had agreed in 1979 to eliminate dual chapel seniority.

Thus, the Union concludes, the arbitrator was required to find in the Union's favor once he decided that the parties had not negotiated away dual chapel seniority in 1979. This contention would be true only if the Company had agreed with the Union's position that an established past practice could be altered or eliminated only through negotiations.[1] Since the Company did not concede that point, but rather argued in the alternative that an established past practice could also be altered by a change in the conditions giving rise to the past practice, the arbitrator was not confined to deciding whether the parties' past practice had been altered by negotiation alone.

The Union's second argument is that the arbitrator's award did not draw its essence from the collective bargaining agreement because it violated section 37 of the agreement, which provides that "[t]he arbitrator shall not have jurisdiction or authority to add to, subtract from, or modify this Agreement." The Union contends that once the arbitrator determined that an established past practice existed, the practice became part of the collective bargaining agreement such that the arbitrator had no authority to eliminate the past practice from the agreement.

We find this argument unpersuasive. A recurring issue throughout the history of labor arbitration has been the effect and enforceability of past practice. As noted in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960):

> There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages.

> Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement.

*Id.* at 579–80, 80 S.Ct. at 1351 (quoting Cox, *Reflections Upon Labor Arbitration*, 72 Harv.L.Rev. 1482, 1498–99 (1959)). The existence of this "industrial common law" does not necessarily mean, however, that the parties should be bound by their customs to the same extent as by explicitly negotiated provisions in their collective bargaining agreement. Unlike contractual agreements, past practices may not always be the result of joint determination:

> They may be mere happenstance, that is, methods that developed without design or deliberation. Or they may be choices by Management in the exercise of managerial discretion as to the convenient methods at the time. In such cases there is no thought of obligation or commitment for the future. Such practices are merely present ways, not prescribed ways, of doing things.

Elkouri & Elkouri, *How Arbitration Works* 394 (3d ed. 1976) (quoting *Ford Motor Co.*, 19 Lab.Arb. (BNA) 237, 241–42 (1952)). To place past practice on a par with the parties' written agreement would "create the anomaly that, while the parties expend great energy and time in negotiating the details of the Agreement, they unknowingly and unintentionally commit themselves to unstated and perhaps more important matters which in the future may be found to have been past practice." *Id.* Thus, once a past practice is established, it is not always enforced by arbitrators to the same extent as contractual terms, *see* Elkouri & Elkouri, *How Arbitration Works*

---

1. The Company's attempt to negotiate away the dual chapel seniority system in 1979 was not, as the Union asserts, a concession that the *only* way to change the past practice was through negotiations. The Company sought to negotiate the matter of dual chapel seniority of its own accord, and it was only after those negotiations failed to produce agreement that the Company unilaterally abolished the system. This apparent good faith attempt to resolve the matter amicably before resorting to unilateral action did not estop the Company from exercising its ultimate right, because of the changed conditions, to switch from dual chapel to company-wide seniority without the Union's consent.

400, and may be modified or eliminated by the employer where the underlying basis for the practice has changed, *id.* at 401. *See also Newport News Shipbuilding & Drydock Co.*, 48 Lab.Arb. (BNA) 1239, 1243–44 (1967) (upholding management's unilateral elimination of twenty-five year practice of paying painters for 10 minutes of overtime to clean their brushes when management no longer required the overtime work that was the underlying reason for the practice); *Gulf Oil Co.*, 34 Lab.Arb. (BNA) 99, 100 (1959) ("It must be stated as a general proposition that, absent language in a collective bargaining agreement expressly or impliedly to the contrary, once the conditions upon which a past practice has been based are changed or eliminated, the practice may no longer be given effect.").

■ In sum, although the arbitrator in this case found that dual chapel seniority was an established past practice, the seniority system did not automatically become enshrined as part and parcel of the collective bargaining agreement, with the same binding effect on the parties as their contractual provisions.[2] Rather, the arbitrator was entitled to determine whether there was a change in conditions such that the past practice should not be deemed part of the written agreement in the first instance. Section 37 of the parties' collective bargaining agreement only prohibited the arbitrator from subtracting from the agreement itself. Since the arbitrator never found that dual chapel seniority, although an established past practice, was part of the collective bargaining agreement, he did not violate the collective bargaining agreement when he determined that the Company was entitled unilaterally to terminate dual chapel seniority.

Having concluded that the arbitrator's award "drew its essence" from the collective bargaining agreement, we may not further review the arbitrator's finding that there was a change in conditions sufficient to justify the Company's unilateral elimination of dual chapel seniority. The district court's decision upholding the arbitrator's award in favor of the Company is accordingly AFFIRMED.

---

2. The Union argues that the Supreme Court mandated this result in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), when it stated that "the practices of the industry and the shop ... [are] equally a part of the collective bargaining agreement although not expressed in it." *Id.* at 582, 80 S.Ct. at 1352. When read in context, however, it is clear that the Court was referring to the source of law that arbitrators, unlike the courts, are able to apply when solving labor disputes because of their familiarity with industry practices. *Id.* at 581–82, 80 S.Ct. at 1352–53. The Court did *not* hold, as the Union contends, that past practices are equivalent to contractual provisions, and thus binding on the parties, in all circumstances and for all purposes.