In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4089

ANHEUSER-BUSCH, INC.,

Plaintiff-Appellant,

v.

BEER, SOFT DRINK, WATER, FRUIT JUICE,
CARBONIC GAS, LIQUOR SALES DRIVERS, HELPERS,
INSIDE WORKERS, BOTTLERS, WAREHOUSEMEN,
SCHOOL, SIGHTSEEING, CHARTER BUS DRIVERS,
GENERAL PROMOTIONS EMPLOYEES, AND EMPLOYEES
OF AFFILIATED INDUSTRIES, MALTSTER, LABORERS,
SYRUP, YEAST, FOOD, VINEGAR, BREWERY,
RECYCLING AND MISCELLANEOUS WORKERS OF
CHICAGO AND VICINITY, ILLINOIS, LOCAL UNION
NO. 744, AFFILIATED WITH THE INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 1424--James B. Zagel, Judge.

Argued JUNE 7, 2001--Decided February 15, 2002


   Before COFFEY, EASTERBROOK and ROVNER,
Circuit Judges.

   COFFEY, Circuit Judge.  Plaintiff-
Appellant Anheuser-Busch, Inc., appeals
the judgment of the district court
upholding an arbitrator's decision in
favor of Teamsters Local Union #744 ("the
Union"), concerning the commission rate
Anheuser-Busch paid its union drivers
pursuant to the terms of a collective
bargaining agreement executed in 1998. We
reverse and remand with instructions to
vacate the award and enter judgment in
favor of Anheuser-Busch, Inc.

I.  FACTUAL BACKGROUND

   Anheuser-Busch Brewing Company (the
"employer") operates a beer
distributorship in Arlington Heights,
Illinois, and employs Union drivers-
salespeople ("drivers") and assistants to
deliver pre-sold products to roughly
1,300 retail accounts in the northern

suburbs of Chicago. The drivers are paid on a commission basis, with the commission rate set forth in a 5-year collective bargaining agreement (the "contract") that took effect February 1, 1998./1 The contract provides one commission rate for drivers who work alone ("one-person routes") and a lower commission rate for drivers who are assisted by a helper ("two-person routes").

From May 1986 to April 1989, the employer and the Union operated under an earlier collective bargaining agreement, which provided that drivers, whether assisted by a helper or not, received the same commission rate. This commission rate became an issue in negotiations, and after long, reasoned, and thorough negotiating sessions, the parties executed a new contract in 1990 that altered the prior commission arrangement and adopted a new two-tiered commission payment structure as referred to above. The same commission rate payment provision was thereafter incorporated into and made a part of the parties' 1994 and 1998 contracts, again after extensive and reasoned negotiations. During the term of the 1990 and 1994 contracts, the employer paid all the drivers at the one-person commission (higher) rate. Anheuser-Busch continued this practice of paying the drivers the increased rate of compensation, in contradiction of the written contract, only during the first two months of the newly negotiated, 60-month 1998 contract. In early April 1998, the company announced that effective April 27, 1998, the drivers would henceforth be reimbursed according to the contract language now in force. According to testimony taken during the arbitration hearings, the decision was motivated by the company's need to create more two-person routes and hire additional helpers in response to an increasing number of customers as well as customer complaints dealing with the timeliness of their deliveries. At this same time, in order to achieve more pay for each driver, the employer reduced the number of routes from ten to nine, eliminating all expenses associated with one route and dispersed the cost savings and workload among the remaining nine drivers. On May 7, 1998, the Union filed a grievance protesting the company's decision to follow the terms of the contract, and the

dispute proceeded to arbitration pursuant to the terms of the agreement.

The parties stipulated to the parameters of the issue as being, "Did the company violate the labor agreement by changing its practice to conform to the contract provision relating to two-person route commission rates?" It is interesting to note that the question presented was: "Is the company violating the contract when complying with the written terms of the most recent labor agreement?" The contract contained two clauses that limited the arbitrator's power, the arbitration clause and the "zipper clause," or merger clause. The zipper clause states that: (1) the written agreement constitutes the full and complete agreement between the parties; and (2) the written agreement supercedes all prior agreements and practices not specifically preserved in the contract. Further, the contract specified that the arbitrator had "no authority to add to, subtract from, modify or change" the terms of the contract. The zipper clause in its entirety reads:

This Agreement constitutes the full and complete agreement between the parties and supercedes all prioragreements between the parties or their representatives, oral or written, including all practices not specifically preserved by the express provisions of this Agreement. This Agreement is the entire agreement between the parties and is the result of extensive negotiations in which both parties had the right and the opportunity to submit proposals and to negotiate their proposals with the other party.

The arbitrator somehow sustained the Union's grievance, and found that the employer's payment of the greater commission rate to all drivers during the brief span of but the first two months (60 days) of the new five-year contract constituted a "practice," in the eyes of the arbitrator, that rose to the level of a "post-execution amendment" of the agreement. This action, according to the arbitrator, allegedly nullified the company's right to invoke the thoroughly negotiated and mutually agreed upon contract provision dealing with the parties' agreement to have the two-tiered commission rate. The arbitrator somehow

made this finding in spite of the very specific and limiting language in the zipper clause of the contract, "This Agreement . . . supercedes all prior agreements between the parties . . . oral or written, including all practices not specifically preserved by the express provisions of this Agreement," as well as the specific arbitration clause forbidding him from modifying the written contract. The arbitrator recognized that the company's April 27, 1998, decision to pay the two-tier (lower) commission rate to drivers working two-person routes was in full compliance with the terms of the collective bargaining agreement agreed to by the Union and the company in each of the three contracts (1990-2003) referred to herein; that the 1998 contract also contained the zipper clause; and that the 1998 contract was the product of exhaustive negotiations. But instead of adhering to the limitations the contract placed on his authority and to the unambiguous and plain language of the contract as it was written, the arbitrator took an end-run around the clear and unambiguous restrictive terms of the contract. The arbitrator somehow reasoned that because the employer allowed the first two months of the sixty-month contract to elapse before changing its practice to adhere to the written contract's commission rates clause, it thus "deprived the Union of its right to bargain [over commission rates] for almost five years," a result that the arbitrator somehow felt (without any explanation) was a "fundamentally unfair maneuver inconsistent with well-settled principles of collective bargaining."

In a vain attempt to find support for his newly fashioned remedy, the arbitrator reached all the way back and justified his overreaching decision in the partial testimony taken at the arbitration hearing that during a worker's strike in 1989, some thirteen years ago, the distributorship's general manager commented to the drivers that the drivers would "have the same pay" whether they worked alone or with a helper. The arbitrator found that this passing state ment somehow and someway became an "oral understanding," which, according to the arbitrator, was "readopted" by the employer during the first two months of the 1998 contract in spite of the fact

that each of the three most recent collective bargaining agreements (ratified in 1990, 1994 and 1998) contained the very explicit and properly limited zipper clause stating that the contract contained the parties' entire agreement, as well as the identical language dealing with commission rates. Further, these contracts failed to contain any indication, much less language, that the parties had reached any type of oral understanding that all drivers would be compensated equally, much less an understanding that was the product of a meeting of the minds reflecting an enforceable agreement supported by offer, acceptance and consideration, which is so vital to any contract.

Thus, the arbitrator cast aside the written and thoroughly negotiated terms of the agreement and returned to the terms of the contract in effect prior to 1990 by ordering the employer to pay the higher commission to drivers regardless of whether they were working on one or two-person routes. This finding by the arbitrator contradicts and ignores the express language throughout the 1998 contract at issue, including the unambiguous terms contained within the commission rates clause, the arbitration clause, and the zipper clause. Moreover, the arbitrator's finding re-institutes the commission structure that the drivers agreed in negotiation to give up as a concession in 1990 and reaffirmed in the last two contracts in 1994 and 1998. The arbitrator summarized his conclusion as follows:

[N]either the zipper clause nor the parole evidence rule bars post-execution amendment or modification of an agreement . . . . Although I cannot "add to, subtract from, modify or change in any way the terms of this Agreement," I am not precluded from giving effect to a long-standing practice or oral understanding reaffirmed and readopted by the Company following execution of the agreement.

The employer filed suit in federal court requesting the court to vacate the award, and the Union counter-claimed for enforcement of the arbitrator's decision. The trial court granted summary judgment in favor of the Union, holding that

because the arbitrator had "interpreted the parties agreement to include both the written [collective bargaining agreement] and a separate oral agreement," the decision should be affirmed under the high degree of deference given to arbitral orders. Anheuser-Busch appeals.

## II.  STANDARD OF REVIEW

In Tootsie Roll Indus., Inc. v. Local Union #1, 832 F.2d 81 (7th Cir. 1987), we set forth the applicable standard of review for arbitration awards. Quoting from language that has been approved in Supreme Court decisions that are of no less vitality today, we stated in pertinent part as follows:

[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

Id. at 83 (quoting United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960)).

[T]he arbitrator's decision should not be upset unless it is arbitrary or capricious or fails to draw its essence from the collective bargaining contract because it exceeds the confines of interpreting and applying the contract . . . . It is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract that the award can be said not to "draw its essence from the collective bargaining agreement."

Id. (quoting Burkort Randall v. Lodge #1076, 648 F.2d 462, 465 (7th Cir. 1981) and Ethyl Corp. v. United Steelworkers of Am., 768 F.2d 180, 184-85 (7th Cir. 1985)).

The Supreme Court recently reiterated that judicial review of an arbitrator's decision is limited, stating that "the fact that a court is convinced [the

arbitrator] committed serious error does not suffice to overturn his decision." Major League Baseball Players Ass'n v. Garvey, 532 U.S. 505, 509 (2001) (quoting Eastern Assoc. Coal Corp. v. Mine Workers, 531 U.S. 57, 62 (2000)) (internal quotations omitted). Thus, we wish to make it clear that we are not questioning whether the arbitrator has misinterpreted the agreement. Rather, our concern is limited to whether the arbitrator wentbeyond, or outside, the bounds of interpreting the contract before him while fashioning his award. The question is not whether the arbitrator misinterpreted the agreement, but only whether the arbitrator's inquiry disregarded the very language of the agreement itself./2 See Chicago Newspaper Publ'rs Ass'n v. Chicago Web Printing Pressmen's Union #7, 821 F.2d 390, 395 (7th Cir. 1987); Hill v. Norfolk & W. Ry. Co., 814 F.2d 1192, 1195 (7th Cir. 1987).

The dissent claims that we may not reverse the arbitrator's decision, "given the law laid down in Garvey." Judge Easterbrook seems to imply that Garvey somehow worked a radical revision of arbitration law. But the dissent's characterization of Garvey as groundbreaking can best be classified as confusing because Garvey contained no landmark reformulation of the standard of review in arbitration cases. In fact, Garvey itself relies on the 42-year-old Enterprise Wheel case, cited throughout the majority opinion, and recognizes that in situations like this, "when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' . . . his decision may be unenforceable." Garvey, 532 U.S. at 509 (quoting Enterprise Wheel, 363 U.S. at 597). The notion that a reviewing court does not review the "correctness" of an arbitrator's conclusion certainly is hardly a novel one. Garvey merely follows Enterprise Wheel--a decision rendered more than forty years ago--and we refuse to accept the dissent's exaggerated implication that it has fundamentally reworked the standard of review in arbitration cases.

We have pointed out that an arbitrator cannot shield himself from judicial correction by merely "making noises of

contract interpretation." Ethyl Corp., 768 F.2d at 187. "In other words, the arbitrator cannot dress his policy desires up in contract interpretation clothing." NIPSCO v. United Steelworkers of Am., 243 F.3d 345, 347 (7th Cir. 2001). In these situations, the arbitrator exceeded the scope of his authority, and his award must be reversed. See Young Radiator Co. v. International Union, UAW, 734 F.2d 321, 325 (7th Cir. 1984) (an arbitration award will not be enforced when the arbitrator "failed to confine himself to the terms of the collective bargaining agreement.").

III. DISCUSSION

Anheuser-Busch claims that the arbitrator modified (rather than interpreted) the terms of the contract when he found a way to employ language not found any place in the contract (in fact contrary to the express language of the contract) by relying on what he referred to as a "long standing practice" (the payment of one commission rate for all drivers) in spite of the very language of the zipper clause stating, "This Agreement constitutes the full and complete agreement between the parties and supercedes all prior agreements between the parties or their representatives, oral or written, including all practices not specifically preserved by the express provisions of this Agreement." The company argues that the very language of the contract contained everything the arbitrator needed to render his decision and barred him from considering the parties' practices. Additionally, the company claims that the arbitrator improperly reached outside the contract and relied on the parties' practices in place of the agreement's clear and unambiguous language requiring the payment of disparate commission rates between drivers working alone and those using helpers. "To place past practice on a par with the parties' written agreement would create the anomaly that, while the parties expend great energy and time in negotiating the details of the Agreement, they unknowingly and unintentionally commit themselves to unstated and perhaps more important matters which in the future may be found to have been past practice." Chicago Web Printing

Pressman's Union #7 v. Chicago Newspaper Publ'rs Ass'n, 772 F.2d 384, 387 (7th Cir. 1985). The employer further contends that the arbitrator exceeded the contract's limitation on his power not to "add to, subtract from, modify or change in any way" the terms of the written 1998 contract. We agree with the employer.

In Tootsie Roll Industries, 832 F.2d at 84, we noted that, "[w]hile [an arbitrator's] reliance on the law of the shop is appropriate to interpret ambiguous contract terms . . . the law of the shop cannot be relied upon to modify clear and unambiguous provisions."/3 See also International Ass'n of Mach., Lodge #1000 v. General Elec. Co., 865 F.2d 902, 906 (7th Cir. 1989) (the "common law of the shop comes into play" only when an ambiguity in the written collective bargaining agreement requires interpretation); Ethyl Corp., 768 F.2d at 186 ("The arbitrator may not modify the contract unless authorized to do so."); Judson Rubber Works, Inc. v. Mfg. Prod'n & Serv. Workers Union #24, 889 F. Supp. 1057, 1066 (N.D. Ill. 1995) (an award will not be enforced when it "draws it essence solely from the parties' past practice.").

In reaching out for some validity in the arbitrator's decision, Judge Easterbrook suggests that the arbitrator was unable to "sharply differentiate pre- from post-signing conduct" and that "[i]t is not sufficient to annul an award that an arbitrator might have acquiesced in a temptation to enforce pre-contractual conduct in the name of fair play." These assumptions are, at best, most problematical. Judge Easterbrook implies that the arbitrator "might" have relied on clearly forbidden pre-arbitration conduct and thus the award should be preserved at all costs. But despite Judge Easterbrook's creative (and factually unsupported) characterization of the arbitrator's opinion, it is clear the arbitrator did actually rely (not might have relied) on the employer's past practices. Indeed, despite the arbitrator's best and vain efforts to disguise the fact that he did rely on past practices, he actually admitted in his decision that he was going outside the very terms of the written contract by stating that he was "giving effect to a long-standing practice or oral

understanding reaffirmed and readopted by the Company." Second, all parties agreed that the contract was clear and unambiguous, facts entirely ignored by the dissent, as well as written in specific language that defined the limits of the negotiated agreement and the scope of the arbitrator's authority. It required neither interpretation nor interpretative devices. In fact, neither the arbitrator nor the parties contend that there is any ambiguity in the language of the contract establishing commission rates for drivers. Thus, there was no need for the arbitrator, in reaching his desired result, to "interpret" the unambiguous contract by reaching outside the contractual language and creating a scheme to rely on past contradictory practices or customs. As we have explained:

The existence of . . . "industrial common law" does not necessarily mean, however, that the parties should be bound by their customs to the same extent as by explicitly negotiated provisions in their collective bargaining agreement. Unlike contractual agreements, past practices may not always be the result of joint determination[.] . . . In such cases there is no thought of obligation or commitment for the future. Such practices are merely present ways, not prescribed ways, of doing things.

Chicago Web Printing Pressman, 772 F.2d at 387.

As stated earlier, the parties to the contract agree, and so do we, that the document at issue in this case is neither ambiguous nor incomplete, and the very language of the contract made clear and specific that the arbitrator was without authority to "add to, subtract from, modify or change in any way the terms of [the] Agreement." Nevertheless, the dissent insists without any reference to the record, much less explanation or discussion, that Arbitrator Berman "performed an interpretive task." But the dissent never explains what this task was or what term, in the contract that the parties agreed was unambiguous, required interpretation. Indeed, the dissent ignores the fact that this contract required no interpretation: the zipper clause was unambiguous; the arbitration clause was unambiguous; and the

commission-rates clause was unambiguous. Any interpretation drawing its essence from the written contract necessarily would have recognized that the arbitrator was without the authority to modify or change the contract in any way. By contrast, in this case, the arbitrator issued an award based not on any reading of or language in the contract, but rather on his personal view of how the contract would read if Anheuser-Busch's conduct were somehow codified and inserted into the document itself. Thus, it is evident that the arbitrator rejected the plain language of the contract, without ever claiming to be "interpreting" any provision of it and in doing so rewrote the contract and inscribed his own language upon the contract; something that he was not authorized to do./4 Another sister circuit very recently agreed. In Pennsylvania Power Co. v. IBEW, 276 F.3d 174 (3d Cir. 2001), the Third Circuit reversed the award of an arbitrator who ignored a zipper clause like the one in this contract and, by considering the parties' practices and other extrinsic evidence, "exceeded his powers under the Agreement" and "altered the Agreement in direct violation of its provision that he had no power to do so." Id. at 179. The court held that "the arbitrator's decision conflicts with the express provisions of the Agreement between the Company and the Union" and therefore, "fails to draw its essence from that Agreement." Id. at 181.

   Carefully written, well-reasoned, and throughly negotiated contracts are presumptively complete, and the added presence of a merger clause is further strong evidence "that the parties intended the writing to be the complete and exclusive agreement between them." Regensburger v. China Adoption Consultants, Ltd., 138 F.3d 1201, 1206 (7th Cir. 1998). The dissent states in seeking to avoid the impact of the merger clause and suggests that the arbitrator made an "effort to interpret the contract by reference to post-signing conduct, and a collective bargaining agreement may be altered by the post-signing acts of the party sought to be bound." He (dissenting judge) goes on to cite several cases, contending that they support his theory that "a collective bargaining agreement may be altered by the post-signing acts

of the party sought to be bound." But it is obvious that these cases are irrelevant; none of the contracts in those cases contain a strong, rock-solid zipper clause as well as an arbitration clause barring the arbitrator from "adding to, subtracting from, modifying or changing in any way the terms of the Agreement." Further, as Judge Rovner explains (contrary to the dissent's notion that the concurring opinion supports the dissent's theory) that whether the arbitrator was justified in concluding that Anheuser-Busch effectively modified the contract "is not a question we are called upon to answer, for that is not what the arbitrator held." There would be no need to prevent the arbitrator from "adding to, subtracting from, modifying or changing in any way the terms of the Agreement" unless the parties clearly intended to prevent the arbitrator from relying on what the dissent calls "post-signing conduct" when interpreting the agreement.

   Let us not forget that the parties have stipulated that the contract before us is an unambiguous, exclusive statement of the parties' rights and obligations. The conduct of the parties is absolutely irrelevant in situations like this involving a dual zipper clause-arbitration clause, as the Second Circuit noted in Leed Architectural Prods., Inc. v. United Steelworkers of Am., 916 F.2d 63, 67 (2d Cir. 1990). In Leed, the court considered the effect of an arbitral clause, like the one in this case, which "denie[d] the arbitrator the right to 'add to, subtract from, or any way modify' its terms." Id. at 66. The court held that "[t]he 'zipper clause' in [the] collective bargaining agreement, which denies the arbitrator the right to 'add to, subtract from or in any way modify' its terms, is a pragmatic restatement of the above holdings. Its purpose is to make the written contract the exclusive statement of the parties' rights and obligations." Id. Thus, Leed makes clear that the combined effect of the arbitration and zipper clauses was to prohibit the arbitrator from deviating from the clearly defined and thoroughly negotiated written contract.

   The arbitrator's decision paid only lip service to the limitations on his authority imposed by the combination of

the language of the arbitration clause and the zipper clause. He saw fit to withdraw the commission provision specifically delineated in the 1990, 1994, and 1998 contracts and proceeded to add to the agreement while ignoring its clear language and intent and substituted his personal views of fairness based on a factor he was forbidden to consider, namely the parties' past practices. The dissent cleverly makes only a brief, passing reference to the arbitration clause, suggesting without explanation, that it is not "sound to read a no-arbitral-modification clause as if it were a no-arbitral-error clause" (emphasis added). The dissent's argument is premised upon its assumption (unsupported by any reference to the wording in the arbitrator's decision) that the arbitrator made "an effort to interpret the contract"--even though the unambiguous and thoroughly negotiated, written contract barred any such interpretation--when he concluded that Anheuser-Busch had itself modified the deal. But were we to accept the dissent's theory, an arbitrator need only claim that he concluded, as did this arbitrator, the "parties modified the contract" in order to completely eviscerate all judicial review, which is what the arbitrator has attempted to do here. We cannot agree to such a view. Garvey makes clear that arbitrators cannot stray "from interpretation and application of the agreement." 532 U.S. at 509. As we have pointed out, an arbitrator cannot "dress his policy desires up in contract interpretation clothing"; a wolf in sheep's clothing is still nothing other than a wolf. NIPSCO, 243 F.3d at 347 (emphasis added). In this case, the contract was clear and unambiguous and needed no interpretation. Accordingly, we are convinced that the arbitrator, not the parties, modified the contract and thereby exceeded his authority.

Arbitrators must not "stray from interpretation and application of the agreement and effectively 'dispense . . . [their] own brand of industrial justice.'" Garvey, 532 U.S. at 509 (quoting Enterprise Wheel, 363 U.S. at 597). But that is precisely what the arbitrator did when he cast aside the extensively negotiated contract and ignored the clear and specific language of the commission-

rates clause, the arbitration clause, and the zipper clause. Indeed, the arbitrator himself admitted when he stated that the employer's decision to adhere to the contract as negotiated and written, rather than its past practice, was a "fundamentally unfair maneuver," making clear that the decision, in spite of the arbitrator's sleight of hand, dispensed the arbitrator's own brand of industrial justice.

We note further that the arbitrator's personal opinion concerning the "fairness" of the employer's actions is lacking of support in the record. He went on to find inequity in the fact that Anheuser-Busch's decision to abide by the contract "deprived the union of its right to bargain" over commission rates during the remaining term of the 1998 contract. But this analysis ignores the obvious fact that between 1990 and 1998, the Union and the employer, after extensive negotiation on each occasion, agreed to all the terms of the most recent contract, including the agreement's specific commission structure and the zipper clause not once, but on three different occasions (in 1990, 1994, and 1998). Furthermore, despite the fact that the record reflects that the Union agreed to the inclusion of the language of the two-tiered commission provision in the two previous contracts as well as in the current agreement, nothing contained herein indicates that the Union was surprised in any manner, much less precluded from renegotiating the commission rates for drivers during the respective bargaining sessions concerning each of the three contracts. The zipper clause set forth in each of the three contracts, as ratified by the Union on three different occasions, clearly states that the contract "is the result of extensive negotiations in which both parties had the right and the opportunity to submit proposals and to negotiate their proposals with the other party." It is also most interesting to note that all of the witnesses called to testify at the arbitration hearing (both Union and employer) agreed that they were fully cognizant of the fact that the two-tiered commission structure and the zipper clause was included in each of the three contracts. The witnesses further testified that following the execution of the first contract in 1990, the employer

made absolutely no "promises" or "oral agreements" to the Union that payment of only the greater commission rate would continue into the future.

In any event, the word "fairness" is as wide and as deep as the ocean and can have a multitude of meanings depending on an individual arbitrator's personal whims and caprice. Thus, any decision motivated by an arbitrator's view of what is "fair" is prohibited by the rule that "[a]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice," and that "courts have no choice but to refuse enforcement of the award" when the award fails to "draw its essence from the collective bargaining agreement." Enterprise Wheel, 363 U.S. at 597. The arbitrator's reliance on the supposed "unfairness" of the employer's conduct is also at odds with our prior holding that "the arbitrator cannot dress his policy desires up in contract interpretation clothing." NIPSCO, 243 F.3d at 347; see also Appalachian Reg'l Healthcare, Inc. v. United Steelworkers of Am., 245 F.3d 601, 606 (6th Cir. 2001) ("even if we were to credit the arbitrator's construction of the Agreement as against its conflict with express provisions, we would still have to vacate the award as it imports notions not found in the Agreement itself.").

Judge Easterbrook goes on to argue that "[m]any a reference to 'fairness' is just a code word for a genuine interpretive principle," and points to the doctrine of "good faith and fair dealing" in contract law as an example. In an attempt to invent a cover for the arbitrator, the dissent implies that the arbitrator in this case was inartfully attempting to ground his decision using some similar interpretive device. However, the dissent fails to point to even a scintilla of evidence in the record to support its speculation that the arbitrator was relying upon any interpretive principle in fashioning his award. On the other hand, because the arbitrator explicitly stated that his award was designed to stamp out what he saw as "fundamentally unfair maneuver[s]" that worked to what he believed was the detriment of the labor union, we are quite confident that he was simply effectuating his personal

bias regarding proper labor-management relations. If the arbitrator's decision is read, and attention paid to the context in which the arbitrator uses the word "fairness," it is clear that the arbitrator reference to 'fairness' was not mere slippage of tongue, as the dissent argues in an unconvincing attempt to explain away the arbitrator's actions; instead it was a--clear and unambiguous--statement that unequivocally denounced the employer's actions on the basis that they failed to comport with the arbitrator's subjective notions of fairness in the collective bargaining process. A thorough reading of the record makes clear that the arbitrator did more than errantly invoke contract principles when he branded the employer's actions "unfair."

The majority opinion makes it perfectly clear that the arbitrator disregarded the plain language of the contract, including, but not limited to, language in the zipper clause, the arbitration clause, and the commission rates clause. Nevertheless, the dissent would uphold the arbitrator based on mere speculation that the arbitrator relied on some unspoken interpretive device when reading the contract. Were we to accept the dissent's theory, then it would never matter whether the respective parties thoughts and ideas are clearly and unambiguously drafted and documented, nor how thoroughly the parties negotiated, nor how clearly the parties placed a precise issue before the arbitrator: if the arbitrator personally felt offended by one party's conduct, we would still uphold his award and permit him to impose his own brand of industrial justice upon the parties under the guise of "good faith." We cannot and will not accept this view. See Enterprise Wheel, 363 U.S. at 597.

The arbitrator attempted to cloak his actions with "noises" of contract interpretation, but he improperly used the parties' practices to add to the agreement, and his decision reads as though it was deeply rooted in his own personal idea of industrial justice, rather than living up to the very specific language of the contract at issue. It is particularly telling that the arbitrator, while on the one hand claiming to consider practices occurring

only during the first two months of the 1998 contract, actually relied on the fact that the employer's payment of the higher commission rate to all drivers was, to quote the arbitrator's own words, a "long-standing practice or oral understanding" to which he was giving effect. Had the arbitrator abided by the terms of the contract and disregarded past practices and "understandings" as he was bound to do by both the zipper clause and our case law, he certainly would have recognized and concluded that he had no authority to consider, much less rely upon, any supposed "long-standing practice."

The arbitrator took it upon himself to right what he perceived to be a wrong in the workplace. In doing so, he improperly injected his personal notions of fairness into his decision and thus manifested "an infidelity to his obligation" to follow the law and the language of the contract and not to "add to . . . modify or change" any portion of the thoroughly negotiated agreement. See Tootsie Roll, 832 F.2d at 83-84. Long and thoroughly negotiated written contracts would cease to have meaning should we approve of the actions of the arbitrator and allow him to completely ignore and disregard and cast aside clear and unambiguous contractual language and traverse beyond the limited scope of his review merely by invoking the magic words "contract interpretation." We are convinced that the arbitration decision in this case failed to "draw its essence" from the collective bargaining agreement that took effect on February 1, 1998, because the decision exceeded the confines of interpreting and applying the contract.

On a final note, we agree with the dissent that one purpose of arbitration is to provide the parties with swift, inexpensive, and final decisions. But this does not vitiate judicial review of an arbitrator's decision. Arbitrators are not free to dispense their own brand of industrial justice and "may not ignore the plain language of the contract." Paperworkers v. Misco, Inc., 484 U.S. 29, 38 (1987) (emphasis added). Thus, while the parties may agree to arbitration, they may also agree, as they did in this contract, to limit the arbitrator's authority and preserve their right to challenge decisions when the arbitrator

has reached out and rendered a decision that strays beyond his delegated authority and is barred by the negotiated contract. See George Watts & Son, Inc. v. Tiffany & Co., 248 F.3d 577, 581 (7th Cir. 2001) ("People who want their arbitrators to have fewer powers need only provide this by contract."). In this case, the arbitrator ignored the plain language of three clauses in the contract--the clause concerning commission rates, the zipper clause, and the arbitration clause--all of which limited his authority and were written by the parties to prevent the type of improper award that is the subject of this appeal. See IBEW v. Thomas & Betts Corp., 182 F.3d 469, 472 (6th Cir. 1999) ("When a collective bargaining agreement prohibits the addition of contract terms, the arbitrator may not proceed to do so.").

The arbitrator did not merely misread the contract; he intentionally disregarded and thus violated the clear, specific language of the contract, and created an escape hatch through which he could dispense his own brand of industrial justice. Accordingly, the judgment of the district court is REVERSED. This case is REMANDED with instructions to VACATE the award of the arbitrator and ENTER judgment in favor of Anheuser-Busch, Inc.

FOOTNOTES

/1 In order to compensate drivers equally, the contract also provides that some drivers on low volume routes receive a salary in addition to the commissions earned.

/2 The dissent states "for the sake of argument" that the arbitrator "made a whopper of an error, the sort of thing that the Supreme Court called an 'improvident, even silly' conclusion." We are somewhat puzzled by Judge Easterbrook's apparent eagerness to joust over the merits of the arbitrator's decision--something which is beyond the scope of our review. We emphasize that we neither allege that the arbitrator committed clear error nor reached an untenable conclusion based on poorly supported factual findings. To the contrary, we are convinced that in his opinion the arbitrator deliberately disregarded the clear language of the contract--and thus his award failed to construe or apply the contract.

/3 Our cases use the phrase "law of the shop," to

refer to "the body of past practices between the parties." Tootsie Roll, 832 F.2d at 84.

/4 The dissent suggests that "if the dispute is arbitrable, then the adjudicator acts 'within his authority' even if the decision is bad on the merits" and thus because the dispute was arbitrable, the arbitrator made only an interpretive error. We disagree. The dissent appears to equate jurisdiction with authority, but an arbitrator can act within the scope of his jurisdiction (reviewing an arbitrable matter) and still exceed the scope of his authority (by ignoring the plain language of the contract that limits his authority). To state otherwise is to ignore much of the caselaw cited throughout this opinion.

In this case, let us make clear that the dissent fails to point out a single clause in this thoroughly negotiated contract that the parties or the arbitrator labeled as ambiguous--because, quite simply, everyone involved agreed that the contract was unambiguous. Further, the arbitrator failed to offer any justification for how his decision was derived from the language of the contract, as it could not, because the language employed by the arbitrator is contrary to the express terms of the contract. As we explain more fully in the text of the opinion below, the arbitrator's decision is a transparent effort to burden the parties with his own personal, subjective notions of fairness in collective bargaining. The arbitrator exceeded his authority, as we discuss more fully below, not because he made an interpretive error--but instead because he modified the terms of a clear and unambiguous contract that needed no interpretation whatsoever.

ROVNER, Circuit Judge, concurring in the judgment. The 1998 collective bargaining agreement, as written, gave Anheuser-Busch the authority to pay individuals working on two-person routes a lower commission than workers assigned to one-person routes. The unambiguous terms of that agreement also barred the arbitrator from looking to practices pre-dating the agreement (what Judge Easterbrook refers to as "pre-signing conduct") as a source of new or modified contract terms; Article 20, Section 20 expressly provided that "[t]his Agreement constitutes the full and complete agreement between the parties and supersedes all prior agreements between the parties or their representatives, oral or written, including all practices not specifically preserved by the express provisions of this Agreement." (Emphasis mine.) We are agreed, therefore, that any prior oral understandings that Anheuser-Busch may have

had with the union, and any previous practice with respect to the commissions paid on two-person routes, cannot be imported into the 1998 agreement.

Whether the arbitrator would have been justified in concluding that Anheuser-Busch's practice, for two months after the 1998 agreement took effect, of paying workers on two-person routes at the higher, one-person rate (what Judge Easterbrook refers to as "post-signing conduct") effectively modified the terms of the 1998 Agreement, is not a question we are called upon to answer, for that is not what the arbitrator held. The arbitrator never inquired whether the parties' post-signing conduct was sufficient, in and of itself, to trump the plain language of the contract. At all times, he was concerned with whether the parties had signaled an intent to carry forward their pre-signing understandings and practices in the 1998 Agreement. This much is evident from the way in which the arbitrator framed the question before him: "I must decide whether a long-standing past practice supersedes the contract language." Arbitrator's Opinion and Award at 17 (emphasis mine), quoting the Union's Brief at 12. But that question is answered unequivocally by Article 20, Section 20--all prior practices not expressly preserved by the contract are displaced, and the written terms of the contract control.

True enough, the arbitrator did advert to the parties' post-signing conduct. But as the arbitrator's rationale makes plain, he viewed the post-signing conduct as a window onto the parties' past practices, not as an independent revision of the 1998 terms regarding commission rates. What the arbitrator seized upon is the parties' failure, upon execution of the 1998 Agreement, to promptly abandon their pre-signing practice and conform their conduct to the pertinent terms of the new contract--as if longstanding practices were to be read into the contract unless timely discontinued by the parties. See Arbitrator's Opinion and Award at 22 ("Had the practice under review not been carried over into the term of the 1998-2003 Agreement, the zipper clause, as well as the parol evidence rule, would undoubtedly have invalidated it."). In the end, it is the parties' pre-signing conduct that the arbitrator read into the contract; their post-signing conduct is cited merely as a convenient bootstrap to reinsert a longstanding, but unwritten, practice into the agreement. See, e.g., Arbitrator's Opinion and Award at 20 ("the Company did, in fact, carry the practice embodied in Green's [1989] promise into the 1998-2003 contract"). Yet, the unmistakable effect of Article 20, Section 20 is to wipe the slate clean of such

previous understandings and practices. And no one is arguing that the parties modified or abandoned that provision. Without the pre-signing conduct to rely upon, the arbitrator's construction of the agreement is wholly bereft of support.

I do not think that the arbitrator was acting in bad faith, or that he purposely set about to dispense his own brand of industrial justice. His own perception of the equities do appear to have influenced his construction of the contract, however. See, e.g., Arbitrator's Opinion and Award at 23-24. More importantly, I think it evident that his decision purporting to interpret the 1998 agreement relied substantially on the unwritten understandings and lengthy course of conduct that preceded that agreement--and resort to such pre-signing conduct was verboten under the express terms of the contract. To that extent, I agree that the arbitrator exceeded his authority, and that his award must be vacated.

Easterbrook, Circuit Judge, dissenting.  Arbitrator Herbert M. Berman found that Anheuser-Busch and its drivers' union had modified their written collective bargaining agreement by post-signing conduct. The district court enforced that decision. Now this court reverses. My colleagues' separate opinions rely principally on the agreement's integration clause, which forbids any reference to pre-signing conduct and negotiating history. The arbitrator's decision, my colleagues believe, effectively bound the employer to continue its pre-agreement treatment of two-driver routes, thus offending the integration clause.

Because the post-agreement conduct was a continuation of pre-agreement conduct, this is a possible understanding of what happened, but it is not an inevitable one. Arbitrator Berman recognized that the zipper "clause invalidates prior agreements and prior practices not incorporated into the written contract" (see page 22 of his opinion). He wrote that Anheuser-Busch modified the deal, to the union's benefit, when it continued paying the higher rates for two months after the new collective bargaining agreement became effective. This may be right or wrong--if our review were plenary, I would join my colleagues in holding that it is wrong--but it does not transgress the integration clause. It is an effort to interpret the contract by reference to post-signing conduct, and a collective bargaining agreement may be altered by the post-signing acts of the party sought to be bound. See Transportation-Communication Employees v. Union Pacific R.R., 385 U.S. 157, 160-61 (1966); see also International Business Lists, Inc. v. American

Telephone & Telegraph Co., 147 F.3d 636, 641 (7th Cir. 1998); Matuszak v. Torrington Co., 927 F.2d 320, 324 (7th Cir. 1991). Judge Coffey denies the applicability of this principle on the ground that an integration clause (which negates the significance of pre-signing words and conduct) makes post-signing modification by conduct impossible. This reads into the clause more than it contains. But if, as Judge Coffey believes, matters turn on the meaning of the particular text in this zipper clause, that is itself a subject for the arbitrator, and a court's disagreement with an arbitrator's understanding of contractual language does not justify displacement of the arbitrator's decision.

To see the difference between misinterpreting clear language and ignoring it, consider a clear federal statute--42 U.S.C. sec.1997e(a), the exhaustion requirement in the Prison Litigation Reform Act. This law provides that "No action shall be brought with respect to prison conditions under [42 U.S.C. sec.1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facilityuntil such administrative remedies as are available are exhausted." Some courts of appeals concluded that, even if some administrative remedies are "available," exhaustion is unnecessary unless these are the same remedies the prisoner seeks in court. Booth v. Churner, 121 S. Ct. 1819 (2001), holds that this is not what the statute means: exhaustion always is required. Should the Supreme Court have said that the courts of appeals that had come to a different conclusion "ignored" sec.1997e(a) or "dispensed their own brand of prison justice"? What it actually said is that those courts misinterpreted sec.1997e(a). It is clear and comprehensive (just like the zipper clause in this collective bargaining agreement), but texts that seem clear to some readers may be understood differently by others. This difference need not imply that one side has ignored the text or decided on grounds extrinsic to it. Arbitrator Berman did not ignore or refuse to follow the integration clause; he discussed it and explained why, in his view, it does not have the effect that Anheuser-Busch and my colleagues attribute to it.

Nor does the award offend the clause forbidding the arbitrator to modify the contract. The arbitrator concluded that Anheuser-Busch had itself modified the deal, and nothing in this collective bargaining agreement forbids post-signing changes by the employer that benefit the employees. It would not be sound to read a no-arbitral-modification clause as if it were a no-arbitral-error clause (on the ground that if the arbitrator errs then he has effectively modified the contract);

that would imply that courts intervene to correct all blunders. Likewise with the question whether an arbitrator has "exceeded his authority." A court exceeds its authority when it acts without jurisdiction; so too with an arbitrator. But if the dispute is arbitrable, then the adjudicator acts "within his authority" even if the decision is bad on the merits. To say otherwise is to turn every interpretive error into a decision "in excess of authority" (because no arbitrator is "authorized to err") and so to make every error (perhaps every "plain" error) a ground for refusing to enforce the award. The parties concede that the dispute at hand was arbitrable. Thus one cannot say that arbitrator Berman "exceeded his authority" because he may have misunderstood or misapplied an integration clause that we judges find clear. The Justices themselves sometimes infer exceptions to the seemingly clear and sweeping language of statutes. E.g., INS v. St. Cyr, 121 S. Ct. 2271 (2001). Even when a forceful dissent remarks on the lack of a textual basis for the maneuver (as in St. Cyr) the majority does not concede that it has either exceeded lawful authority or failed to interpret at all.

Judge Rovner and I agree that post-signing conduct by an employer may in principle create legal obligations as an alteration of the agreement. We agree, moreover, that arbitrator Berman acted in good faith and did not attempt to smuggle into the award preconceptions about labor's entitlements. He did not, for example, implement personal notions about the appropriate relative wages for one-driver and two-driver delivery systems. Likewise we agree that because the employer's post-signing conduct is identical to its pre-signing conduct, it is very hard to disentangle the two--and that there is a corresponding temptation to enforce the pre-signing conduct in the name of post-signing acts. The arbitrator's reference to "fairness" permits an inference that he took that forbidden step, and both of my colleagues fault him on this ground. Avoiding the "f" word in both contemplation and exposition promotes clear thought and accurate decision. Yet it cannot be that every opinion referring to "fairness" shows that the law and the parties' dealings have been put to one side. If that were so, a goodly number of our own opinions would be suspect. Many a reference to "fairness" is just a code word for a genuine interpretive principle. The misleadingly named doctrine of "good faith and fair dealing" in contract law is an example. See L.A.P.D., Inc. v. General Electric Corp., 132 F.3d 402 (7th Cir. 1997).

Having come this far together, Judge Rovner and I part company. She concludes that the arbitrator

did not rely on Anheuser-Busch's post-agreement conduct. By this she means that the arbitrator did not implement post-signing conduct "in and of itself" (slip op. 22)--that is, taken in isolation from the pre-signing conduct. She also believes that the arbitrator was swayed at least in part by a desire to achieve a more fair outcome. I accept these as factual propositions but do not think they have legal consequences. How could an arbitrator sharply differentiate pre- from post-signing conduct? One was a continuation of the other. It is not sufficient to annul an award that an arbitrator might have acquiesced in a temptation to enforce pre-contractual conduct in the name of fair play. Even judges often say that they reach one result over another in interpreting a contract because they think the result better on grounds of policy (a more concrete substitute for "fairness"). By ruling that considerations of this kind spoil an award my colleagues yield to a temptation of our own profession--to equate an interpretive error with failure to interpret the contract at all.

"[T]he question for decision by a federal court asked to set aside an arbitration award . . . is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." Hill v. Norfolk & Western Ry., 814 F.2d 1192, 1194-95 (7th Cir. 1987). Arbitrator Berman performed an interpretive task--one complicated by the rule that post-signing conduct can become a contractual obligation, and by the fact that the post-signing conduct continued a practice that predated the latest collective bargaining agreement, but an interpretive exercise nonetheless. Parties who want to preclude courts or arbitrators from treating their course of performance as altering the bargain have only to provide that deals may not be modified by conduct (or, more broadly, in any way other than writing). No such clause appears in this collective bargaining agreement. Let me harp on a vital point: to the extent that the real dispute is about the meaning and effect of the zipper clause, that is itself a matter of contractual interpretation on which the arbitrator's view is conclusive. The conclusions on which Judge Rovner and I agree--that the arbitrator was not "acting in bad faith, [and that he did not] purposely set about to dispense his own brand of industrial justice" (slip op. 23)--should lead straight to an order enforcing the award, for if he was not ladling out "his own brand of industrial justice" then he must have been implementing the parties' bargain as he understood it, rather than acting on extra-contractual grounds.

Last May the Supreme Court reiterated the principles that govern the enforcement of arbitral awards:

Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. Paperworkers v. Misco, Inc., 484 U.S. 29, 36 (1987). We recently reiterated that if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62 (2000) (quoting Misco, supra, at 38). It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispenses his own brand of industrial justice" that his decision may be unenforceable. Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960). When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, factfinding" does not provide a basis for a reviewing court to refuse to enforce the award. Misco, 484 U.S. at 39.

Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 121 S. Ct. 1724, 1728 (2001). I am willing to concede for the sake of argument that arbitrator Berman made a whopper of an error, the sort of thing that the Supreme Court called an "improvident, even silly" conclusion. Nonetheless, given the law laid down in Garvey and its predecessors, the award must be enforced--for the parties delegated interpretation to an arbitrator, not a court. To equate error with non-interpretation is to vitiate the doctrine that awards must be enforced even if they reflect factual, interpretive, or legal blunders, see George Watts & Son, Inc. v. Tiffany & Co., 248 F.3d 577 (7th Cir. 2001), and to deprive the parties of what they bargained for when they chose arbitration: swift, inexpensive, and final decision. Arbitration can be neither swift nor inexpensive if it is not also conclusive; otherwise parties are just adding one layer to those that courts provide already.